**Preston WADE, Geraldine Wade, Appellants,**

v.

**Michael GEREN, Appellee.**

**Nos. 67271, 67828.**

Supreme Court of Oklahoma.

Sept. 22, 1987.

Mike Sullivan, Poteau, for appellants.

Douglas W. Sanders, Sr., Poteau, for appellee.

Sarah Allen, Poteau, for the Minor Child.

SUMMERS, Justice.

This is a suit between a child's natural father and her maternal grandparents.

The grandparents adopted the child in Oklahoma with the mother's consent but without notice to the natural father. At the time of the adoption a suit was pending in Missouri between the father (who was unwed at the birth of the child), the mother, and the grandparents, in which suit the father was seeking to establish his paternity and to win custody of the child. The Oklahoma court was not apprised of the pendency of the Missouri proceedings.

After learning of the adoption the father sued in Oklahoma to vacate that decree, claiming lack of notice and fraud upon the court. The trial court agreed and vacated the adoption. Grandparents appeal, that case being our No. 67,271. A companion habeas corpus action in the trial court was also resolved in the father's favor, and the grandparents appeal in our No. 67,828. The cases are consolidated under the earlier number.

We affirm.

## FACTS

Michael (father, plaintiff and appellee) was 16 in the spring of 1976 when he and Barbara (mother, defendant and appellant) began their relationship in Raytown, Missouri. She was 20 and married, but was in the process of divorcing her husband. About a year later they set up housekeeping together, and on June 25, 1977 she gave birth to the child who is the subject of the suit. They continued to live together until October, 1978, at which time each went home to his/her parents (hers in Missouri, his in Oklahoma). His grandparents, being in Missouri, helped regularly with the babysitting, and he had some visitation through them. In February 1981 the Wades, (her parents, also referred to herein as the grandparents, defendants or appellants) moved to Oklahoma and brought with them the child. Michael enjoyed some periodic visitation through 1981 and 1982 until in June of the latter year he was advised by the Wades that there would be no more.

On August 10, 1982, he filed suit in Missouri to legally establish his paternity,

naming as defendants Barbara, the man to whom she was married at the time of the conception of the child, and later, the Wades. Barbara and her former husband appeared personally and with counsel. The Wades defaulted, but the record supports a finding (and the Journal Entry of Judgment in the case so recites) that they were personally served on the 3rd day of June, 1983.

On August 16, 1982 Barbara filed a petition in Le Flore County, Oklahoma, asking to give custody to the Wades, and a custody order did issue that date in favor of the Wades.

On January 9, 1984 the Wades filed in Le Flore County their petition for adoption with the consent of the mother attached. At the final hearing on the adoption the following colloquy took place:

The Court: As I understand the situation and for the record, is that the father is just completely unknown; is that correct?

Mr. Wade: Right, yes, sir.

The Court: Mrs. Wade, is that correct?

Mrs. Wade: Yes, that's correct.

The Court: The reason for that is to be sure that if something should come up at a later date, that there's no doubt about it, that there's just no way that you all know about the father, and you've never been advised anything about the father whatsoever?

Mrs. Wade: No sir.

Mr. Wade: No sir.

On February 6, 1984 the adoption became final.

On March 13, 1985 Michael filed his petition in Le Flore County to vacate the adoption.

On August 22, 1985, the trial court in Missouri found Michael to be the biological father, and made provisions for custody and visitation between him and Barbara. That decision became final on appeal in Missouri in October, 1986.

On July 28, 1986 the district court of Le Flore County vacated the adoption to the Wades, triggering their appeal to this court. It stayed change of custody pending finality of the Missouri case. When that case became final the Oklahoma court granted Michael's petition for a writ of Habeas Corpus for custody, and provided for the child to go to Missouri on January 9, 1987. That order resulted in the companion appeal filed here.

## ISSUES

### I.

The grandparents claim plaintiff's petition to vacate the decree of adoption is barred by the statute of limitations.

 *In Matter of Adoption of Lori Gay W.*, 589 P.2d 217 (Okl.1979) we had need to determine which of two statutes of limitation applied to actions to vacate adoption proceedings by reason of fraud. 12 O.S.1981 § 1038 provides generally that a judgment based on fraud may be vacated within two years and that a void judgment may be vacated at any time.[1] 10 O.S.1981 § 58 provides that *no adoption* may be challenged after one year from the final decree even if it is void.[2] The *Lori Gay* court, though divided 5–4, opted for the specific adoption statute of one year. *Lori Gay* also imposed upon this sort of litigation what is known as the "discovery rule", in that the statute does not commence to

---

1. 12 O.S.1981 § 1038:
 Proceedings to vacate or modify a judgment or order, for the causes mentioned in subdivisions four, five and seven, of Section 5267 must be commenced within two years after the judgment was rendered or order made, unless the party entitled thereto be an infant, or a person of unsound mind and then within two years after removal of such disability. Proceedings for the causes mentioned in subdivisions three and six of the same section, shall be within three years, and in subdivision nine, within one year after the defendant has notice of the judg-

ment. A void judgment may be vacated at any time, on motion of a party, or any person affected thereby.

2. 10 O.S.1981 § 58:
 No adoption may be challenged on any ground either by a direct or collateral attack more than one (1) year after the entry of the final adoption decree regardless of whether the decree is void or voidable, and the minority of the natural parent shall not operate to event this time limit from running.

run in such cases until the plaintiff knows or with the exercise of reasonable dilgence should have known of the fraud practiced upon him.

That rule saves the plaintiff here, even under the one year statute. The adoption decree complained of became final February 6, 1984. But plaintiff's testimony was that he first became aware of the adoption proceedings after the taking of Barbara's deposition on April 13, 1984.[3] There is thus testimony in the record to support a finding that the filing of his petition to vacate on March 13, 1985 was within one year after he learned of the proceedings he sought to set aside.

## II.

■ The grandparents claim that the trial court erred in determining that the father was entitled to notice of the proceedings.[4] The trial court based its finding that the father was entitled to notice on the fact that, "the putative father has expended a great amount of time, effort, and resources to take on the responsibility for rearing the child and having the opportunity to develop an emotional bonding with his daughter". The court specifically noted that the father had taken the most unusual step of totally assuming his parental responsibility by filing, with notice to all parties in the adoption proceedings, his paternity action in Missouri to judicially establish his biological paternity and right to custody of the child.

The Wades rely on *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) for the proposition:

"Parental rights do not spring full blown from the biological connection between parent and child." Id. 103 S.Ct. at 2992.

The U.S. Supreme Court, in its development of the constitutional theory of parental rights, has given careful attention to the protection to be given to biological parents who have developed emotional bonds with their children. Those emotional bonds are a critical factor in the determination of the constitutional right of parents to maintain a relation with their children. A biological relationship is of constitutional significance because it offers such parents a unique opportunity to develop these emotional bonds with their children.

In *Lehr*, the natural father complained that the state's failure to provide for his participation in the proceedings leading to the adoption of his daughter cut off his opportunity to establish a protected relationship with the child. The Court declared that the State of New York was not required to notify Lehr of, nor allow him to participate in, the proceedings leading to the adoption of his child. The state thus need not always give the father power to veto his child's adoption, nor must the state even consider the father's actual or potential relationship with the child as a factor in determining whether adoption is in the best interest of the child. After *Lehr*, it is clear that in some circumstances the state may constitutionally omit to notify or allow participation by unwed fathers who have never been established officially as being without an interest.

The trial court expressly distinguished *Lehr* from the instant case, quoting *Lehr* as follows:

"When an unwed father demonstrates a full commitment to the responsibilities of parenthood by com(ing) forward to participate in the rearing of his child, *Caban* [*v. Mohammed*], 441 U.S. [380] at 392, 60 L.Ed.2d 297, 99 S.Ct. 1760, [at 1764 (1979)], *his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said he 'act(s)' as a father....*" (emphasis supplied by the trial court). Id. 103 S.Ct. at p. 2993.

The trial court then made the following finding:

---

3. Appellants point us to no testimony to the contrary, although they do allude to language in the Missouri Court of Appeals opinion which could support a contrary factual finding as to when plaintiff first knew.

4. 10 O.S.1986 § 60.6 (3), effective February 1, 1986, and not in effect for these proceedings, would now require notice to an unwed father in Michael's position.

"In this case the Plaintiff and mother lived together during the latter part of the mother's pregnancy and discussed before the birth of the child whether to place the child for adoption. The Plaintiff was present at birth and he and the mother lived together after the child was born. The Plaintiff and his mother assisted in caring for the child. The mother then denied Plaintiff visitation with the child and placed the child in the custody of her parents in Oklahoma. Thereafter Plaintiff filed his paternity action in Missouri and finally this case pursuing the rights awarded in the paternity action."

■ The court concluded that if the Wades had advised the court of the paternity action, rather than that the father was unknown, the proper procedure would have been to notify the father of the adoption proceeding and then stay adoption proceedings until a judicial determination of his paternity had been made. The trial court found that the father had committed himself to and assumed full responsibility for rearing the child, that the Wades' failure to disclose to the court the father's pending paternity action was a fraud on the court, and their failure to notify the father of the adoption proceeding was a denial of due process rendering the adoption void.[5]

In reviewing the facts of this case we cannot say that the court erred in factually distinguishing it from *Lehr*, and in finding that the father was making reasonable efforts to assume responsibility for the care of his child, thus being entitled to notice accordingly.

### III.

■ Grandparents claim that it was error to give full faith and credit to the Missouri judgment. Specifically they point out that the Uniform Child Custody Jurisdiction Act requires more contact with the child than occurred here. They cite us to 10 O.S.1981 § 1605, the Oklahoma counterpart of that act, which provides:

A. A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

1. This state;

a. is the home state of the child at the time of commencement of the proceedings, or

b. had been the child's home state within six (6) months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody of for other reasons, and a parent or person acting as parent continues to live in this state.

Missouri law is the same. It is true that the child had moved to Oklahoma with the grandparents some 18 months before the Missouri paternity action was commenced. Missouri law, however, has held that the Uniform Act does not apply to a suit seeking a determination of paternity (and fixing an obligation for past and future child support). *Sweany v. Meinecke*, 691 S.W.2d 368 (Mo.App.1985). In *Sweany*, the Missouri court held that the appellant's reliance upon the Act to demonstrate that the trial court did not have subject matter jurisdiction and jurisdiction over the parties in a suit to determine paternity was misplaced. It held the Act had no application except in those actions involving dissolution and/or custody.

Here both the natural mother and the father were residents of the state of Missouri at the time the action to determine paternity was commenced in the state of Missouri. The Missouri courts' order for custody and visitation has now become final on appeal, but even if it were subject to attack as being in excess of that court's jurisdiction, the paternity determination must stand. The grandparent's reliance on the Uniform Act to divest the Missouri court of jurisdiction to determine paternity is misplaced.

---

5. Any possibility that failure to advise the court of the pending Missouri action was unintentional was removed by Barbara in her deposition:
 Question: "What was the purpose of the adoption proceeding?"

Answer: "So there wouldn't be any way Mike could get custody of her."

### IV.

Finally, grandparents urge that the trial court failed to consider the best interest of the child, citing *In re: Adoption of Graves*, 481 P.2d 136, 138, wherein we said:

"[T]he adoption statute is strictly construed in favor of rights of natural parents when the controversy is between the natural parents and persons seeking to destroy their parental status, but the welfare of the child is not to be ignored in considering the validity of the adoption proceedings."

Wades protest that to take a nine year female child from the only home she has ever known and to place her suddenly with strangers will undoubtedly "heap the most savage emotional trauma upon this young child". They contend, "She is at the most critical age and stage in life to suffer the most from such a sudden change. She is at that stage of life to where she is most dependent upon her established home environment and her known parents."

In response father directs us to portions of the transcript where the trial court labored long and hard as to what constituted the best interest of the child. After having found that the adoption decree could not stand, and having recognized the Missouri judgment determining the biological father of the child, the trial court in response to its own question, "What is in the best interest of the child" said:

"The best interest of any child is to have a stable home with a loving father, and a loving mother, and hopefully some grandparents, and some spiritual guidance, and people who will be interested in the child's moral and spiritual welfare. People who will be interested in the child's education. People who will be interested to see that the child grows up normally in a stable environment.... But at this point in time, this Court does not find why that this child should not have the right to know a father who has fought quite hard obviously through the Courts, and taken very unusual steps to be legally recognized as that father. And this Court is quite concerned that this child, that as the child particularly grows older, of what this child's thoughts may be particularly even of the fact that underneath all this—this trying to reach and going through these—the situations of the person who's been recognized as the father now to establish this parent/child relationship, had been denied this child, and this child had been not denied the association with a natural father. The law recognizes and this—this community recognizes, this State and this Nation, that children—that a parent/child relationship is good, and is valid, and that we encourage a parent/child relationship."

The court had before it evidence that Michael had married in 1980 and that he and his wife now had a small son. It also had evidence that the child in controversy was emotionally and intellectually well adjusted to her present situation, and in fact very attached to her grandparents. But the court recognized that when the adoption decree had to be set aside it could not simply weigh or compare households; absent a showing of unfitness the father as natural parent would be entitled to custody as against anyone else. *Application of Grover*, 681 P.2d 81 (Okl.1984). The court gave thoughtful consideration as to how the change could best be accomplished given the requirements of schooling.

Given all the evidence we cannot say the best interests of the child were ignored. Nor can we say that having determined that fraud had been perpetrated upon the court and that the decree of adoption must be vacated it was error to award custody to the father. The judgment of the trial court is affirmed.

DOOLIN, C.J., HARGRAVE, V.C.J., and HODGES, LAVENDER, OPALA, ALMA WILSON and SUMMERS, JJ., concur.

KAUGER, J., concurs by reason of stare decisis.

SIMMS, J., dissents.