MOORE, Judge.
D.W. (“the father”), who is undisputedly the biological father of B.W.B. (“the child”), appeals from a judgment on partial findings entered by the Mobile Probate Court (“the probate court”) denying his contest to the adoption of the child by J.W.B. and J.J.B. (“the petitioners”) and from a final judgment of the probate court granting the adoption of the child by.the petitioners. We affirm the judgment on partial findings in part and reverse it in part. We reverse the final judgment granting the adoption of the child, and we remand the case for further proceedings.
Procedural History
On June 8, 2013, the petitioners filed a petition seeking .to adopt the child. On August 16, 2013, the father filed a motion to contest the adoption of the child. On December 17, 2013, the petitioners moved to dismiss the father’s contest on the ground that he had failed to register with the Alabama - Putative Father Registry within 30 days of the child’s birth. After a trial, the probate court entered a judgment on partial findings on October 15, 2014, finding that the father had not been married at common law to J.B. (“the mother”), the mother of the child, and that the father lacked standing to contest the adoption of the child because he is not the presumed father of the child and because he did not register with the Alabama Putative Father Registry.[1] That same day, the probate *767 court entered a judgment granting the petitioners’ petition to adopt the child. On October 28, 2014, the father filed his notice of appeal challenging both the judgment denying his right to contest the adoption and the judgment granting the adoption.
Analysis
to 05 I ? s CO O o Qu CD
The father first contends that his consent to the adoption is required because he is the presumed father of the child under Ala.Code 1975, § 26-10A-7(a)(3)a., a part of the Alabama Adoption Code (“the AAC”), Ala.Code 1975, § 26-10A-1 et seq., which provides:
“(a) Consent to the petitioner’s adoption ... shall be required of the following:
[[Image here]]
“(3) The adoptee’s presumed father, regardless of paternity, if:
“a. He and the adoptee’s mother are or have been married to each other and the adoptee was born during the marriage, or within 300 days after the marriage was terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation was entered by a court.”
Section 26-10A-7(a)(3)a. has been interpreted to require the consent to the adoption of a child by a presumed father if the child was born during the presumed father’s common-law marriage to the mother of the child. See S.J.S. v. B.R., 949 So.2d 941, 946 n. 4 (Ala.Civ.App.2006) (recognizing that § 26-10A-7(a)(3)a. applies to children born of common-law marriages). The father maintains that the probate court could not approve the adoption petition over his objection because, he says, he and the mother were, in fact, involved in a common-law marriage when the child was born. The probate court determined that the father did not present sufficient evidence to support his claim of a common-law marriage. On appeal, the father maintains that the probate court erred in that regard.
The elements of a common-law marriage are “1) capacity; 2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and 3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation.” Boswell v. Boswell, 497 So.2d 479, 480 (Ala.1986). “Courts of this state closely scrutinize claims of common-law marriage and require clear and convincing proof thereof.” Baker v. Townsend, 484 So.2d 1097, 1098 (Ala.Civ.App.1986) (citing Walton v. Walton, 409 So.2d 858 (Ala.Civ.App.1982)). “Clear and convincing evidence” is
“ ‘ “[e]vidence that, when weighed against evidence in opposition, will produce in the.mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of .proof greater than a preponderance of the evidence, or the substantial weight of the evidence, but less than beyond a reasonable doubt.” ’ ”
Dyess v. Dyess, 94 So.3d 384, 386-87 (Ala.Civ.App.2012) (quoting L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), quoting in turn § 6-11-20(b)(4), Ala.Code 1975). Whether the proponent of a common-law marriage has proven its elements clearly and convincingly is a question for the fact-finding court. Dyess, supra. If based on *768 oral .testimony by live witnesses, findings as to the existence vel non of a common-law marriage will be accorded a presumption of correctness, and a judgment based on those findings will be affirmed unless it is proven to be plainly and palpably wrong. Lofton v. Estate of Weaver, 611 So.2d 335, 336 (Ala.1992).
The evidence in the record pertinent to this aspect of the appeal is as follows. The father testified that he and the mother had been ceremonially married on January 25, 2011, and had divorced after a hearing that had occurred on May 15, 2012. He testified that a child named L.W. had been born of the marriage on September 1, 2011.
The father testified that he and the mother had reconciled the same day as the hearing in the divorce case. He-testified that, after the divorce, the mother had stayed with him at his. apartment between four and six nights a week, that she had received her mail at the apartment, and that she had kept personal items and clothing there. The father’s sister and sister-in-law also testified that the mother had often stayed at the apartment after the divorce. The mother testified that, after the hearing in the divorce case, she had visited the father at his apartment because he had indicated that he was suicidal. The mother denied that she had spent the night with the father on ' that occasion, and she testified that she had not spent one night at the father’s apartment following the divorce. The mother admitted,- however, that she had used the father’s apartment to receive mail.
The father and members of his family testified that, following the divorce, the mother had referred to the father as her husband and that the father had referred to the mother as his wife. Several witnesses testified that the mother and the father had been seen together at church softball games subsequent to the divorce. A pastor also testified to having seen the mother and the father at church as a couple,-although the pastor acknowledged that unmarried couples also had attended church. The father testified that he had never seen the mother use her maiden name. The mother denied that she had referred to the father as her husband after the divorce. The mother also denied having attended church with the father after the divorce.
The father testified that,, on February 20, 2013, he and the mother had filed their income-tax returns for the 2012 tax year as a married couple and that the'mother had signed the income-tax returns as his spouse, using his last name and listing her address as the address of the father’s apartment. The mother admitted that she had filed a false affidavit indicating that she had not filed a joint income-tax return with the father, but she testified that she had been manipulated into filing that income-tax return. The evidence also shows that the mother had indicated on a Medicaid application that she completed in October 2012 that, at that time, she . was married to the father and was living with him. The mother testified that she had misrepresented her marital status and living arrangement to Medicaid at that time. On a March 31, 2013, Medicaid application, the mother had indicated that. she was divorced.
The father testified that, in July 2012, he had purchased a ring for the mother because they were working out their differ-éncés, that, around Christmas 2012, he had given the mother the ring and had asked her to marry him, and that the mother had agreed. The mother denied that she had received a new wedding ring. The mother and the father applied for a marriage license on March, 20, 2Ó13. The mother testified that she had applied for the mar *769 riage license under duress. The father testified that he and the mother had spoken to the father’s uncle about officiating the wedding but that they had not agreed on a wedding date. The mother testified that she had not informed, anyone of the proposed remarriage despite the publication of the issuance of the marriage license in a local newspaper.
The father testified that, following the divorce, he had helped support the mother and L.W. On October 29, 2012, the mother filed a motion seeking to hold the father in contempt for failing to pay child support for L.W. The father did not raise in that action any claim that he and the mother were common-law married. The father testified that the mother had said that she would take care of the contempt action and for the father not to worry about it, but, he said, the mother had not dismissed the action because she had not wanted her parents to be angry. A judgment for a child-support arrearage had eventually been entered in that case.
The father testified that he and the mother were married at common law in September or October 2012, but, he said, he could not determine the exact date the common-law marriage began. He acknowledged, however, that he and the mother had not believed that they needed a mutual agreement to be married at common law and that, if mutual agreement was an element of a common-law marriage, his claim would fail.
We conclude that the probate court received conflicting evidence on whether the mother and the father entered into a common-law marriage. The father argues that this court should not consider the mother’s testimony because it was rife with admitted misrepresentations; however, it was for the probate court, who viewed the witnesses, to determine which testimony was to be believed. See Etheridge v. Yeager, 465 So.2d 378 (Ala.1985). Moreover, some of the father’s own testimony, including an admission from the father that he and the mother had not had a mutual agreement to enter into a common-law marriage,, casts serious doubt on the father’s claim. The probate court also discounted as unreliably self-serving some of the testimony of the father’s family members that otherwise would have supported a finding of a common-law marriage. Accordingly, the probate court could have reasonably determined that the evidence was not clear and convincing that the father and the mother had entered into a common-law . marriage.. We cannot reweigh that evidence on appeal. See Lawson v. Harris Culinary Enters., LLC, 83 So.3d 483, 491 (Ala.2011) (explaining that ore tenus standard of review applies to judgments on partial findings). Based on that factual conclusion, the probate court did not err in finding that the father was not married to the mother by common law and that the father was not a presumed father under § 26-10A-7(a)(3)a.
II. Ala.Code 1975, § 26-10A-7(a)(3)d.
Section 26-10A-7(a)(3)d. provides;
“(a) Consent to. the petitioner’s adoption. ... shall .be required of the following:
[[Image here]]
“(3) The adoptee’s presumed father, regardless of paternity, if;
[[Image here]]
“d. . He received the adoptee into his home and openly held out the adoptee as his own child.”
The father argues on appeal that, under § 26-10A-7(a)(3)d., a man can become a presumed father by receiving the mother and his unborn child into his home and openly holding out his unborn child as his own child. However, we conclude that the *770 father did not raise that argument in the probate court. •
A close review of the pleadings and motions in this case shows that'the father did not expressly raise that claim below. Based on the state of- the pleadings, on July 28, 2014, the probate court entered an order identifying the “triable issues” as:
“a. ■ Whether [the father] is a ‘presumed' father’ for purposes of the Alabama Adoption Code, which centers on whether [the father] was the common law spouse of [the mother] at the' time of the birth of [the child].
“b. Whether or not [the father] has standing to file the opposition to the adoption of [the child].
“c. Whether or not [the father] has impliedly consented to the proposed adoption.
“d. Whether the adoption of [the child] should be granted.”
At the outset of the trial on October 14, 2014, the probate-court judge reiterated that “the primary issue” to be decided was whether the mother and the father had entered into a common-law marriage. The father did not object to that characterization.
Early in the trial, the attorney for the father began questioning the father’s sister regarding the father’s prebirth conduct toward the child. When the petitioners’counsel objected on hearsay grounds, the father’s attorney responded: “[I]t’s offered to prove the common law marriage that he said this and she said this and they held this child out to be their own and he supported this child.” The probate court sustained the objection. The father later introduced evidence of how he had held out the unborn child as his own, had brought the mother and the unborn child into his home, had attended to the medical needs of the unborn child, and had cared for the mother during her pregnancy. However, throughout the trial, the probate court consistently reminded the parties that the only claim being litigated was the father’s common-law-marriage claim.
Under Rule 15(b), Ala. R. Civ. P., which applies in adoption proceedings before a probate court, see Rule 1, Ala. R. Ciri P., “[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.”
“ ‘[I]mplied consent of the parties can be inferred from an opposing party’s failure to object to introduction of evidence raising the disputed issue initialfy.’ International Rehab. Assocs., Inc. v. Adams, 613 So.2d 1207, 1213 (Ala. 1992) (emphasis added). An opposing party’s failure to object to the introduction of evidence raising an unpleaded claim or defense permits, but does not require, the inference that the opposing party has impliedly consented to litigate the disputed issue. That is so because evidence that supports an un-pleaded claim or defense often overlaps with evidence that supports a pleaded claim or defense, see, e.g., United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., 81 F.3d 240 (D.C.Cir. 1996) (evidence related to unpleaded claim of quasi-contractual unjust enrichment was also relevant to pleaded claim of quantum meruit based on contract implied in fact). Therefore, consent should not be inferred from the failure to object ‘absent a clear indication that the party who introduced the evidence was attempting to raise a new issue,’ International Harvester Credit Corp. v. East Coast Truck and R. V. Sales, Inc., 547 F.2d 888, 890 (5th Cir.1977), and that the relevance of the evidence to the new issue was reasonably apparent to the opposing party whose failure to *771 object can be deemed to indicate an intent to litigate the new issue, see Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F.Supp.2d 514 (S.D.N.Y.2005) (although defendant in copyright-infringement action did not assert the affirmative defense of independent creation in his responsive pleading, the issue was tried by the consent of the parties because evidence was introduced at trial without objection and both parties understood that the defense was at issue). The rule in such cases has been explained as follows:
“ ‘[W]hen the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the subject matter of the amendment, and there was no indication at trial that the party who introduced the evidence was seeking to raise a new issue, the pleadings will not be deemed amended under Rule 15(b)(2)[, Fed.R.Civ.P.]. The reasoning behind this view is sound since if evidence is introduced to support basic issues that already have been pleaded, the opposing party may not be conscious of its relevance to issues not raised by the pleadings unless that fact is made clear.’
“[6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil,] § 1493 at 34-40 [ (2010) ] (emphasis added; footnotes omitted).”
CVS/Caremark Corp. v. Washington, 121 So.3d 391, 398-99 (Ala.Civ.App.2013) (footnotes omitted).
In this case, the evidence upon which the father relies on appeal to prove his unpleaded claim that he is the presumed father of the child under § 26-10A-7(a)(3)d. overlaps with the evidence relating to his pleaded claim that he is the presumed father under § 26-10A~7(a)(3)a. Based on the context in which that evidence was elicited, We conclude that the petitioners could not have been apprised that the father was raising a new and separate claim such that their failure to object can be considered an implied consent to litigate that claim.
In its judgment, the probate court granted the petitioners’ motion for a judgment on partial findings by determining that the mother and the father had' not been common-law married and, thus, that the father was not a presumed father with standing to contest the adoption of the child. The father did not file a post-judgment motion arguing that the probate court had overlooked any alternative claim that he was the presumed father based on his conduct of openly holding out the unborn child as his own and taking the unborn child into his home as required by § 26-10A-7(a)(3)d. The father raises that issue for the first time on appeal. “[An appéllate court] is limited to a review of the record alone, and an issue not reflected in the record as having been raised in the trial court cannot be raised for the first time on appeal.” Totten v. Lighting & Supply, Inc., 507 So.2d 502, 503 (Ala.1987) (citing Mobile Wrecker Owners Ass’n v. City of Mobile, 461 So.2d 1303 (Ala.1984)). “It is a fundamental rule of appellate procedure that, regardless of merits of appellant’s contentions, appellate courts will not review questions not decided by the trial court.” Bevill v. Owen, 364 So.2d 1201, 1203 (Ala.1979). Accordingly, we do not consider this issue.
III. The Putative Father Registry Act
The Putative Father Registry Act (“the PFRA”), Ala.Code 1975, § 26-10C-1, provides that a putative father shall file a notice of intent to claim paternity of a child *772 with a registry established by the-Alabama Department of Human Resources;
“Any person who claims to be the natural father of a child and -fails to file his notice of intent to-claim paternity pursuant to subsection (a) prior-to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption proceeding.”
§ 26-10C-l.(i), Ala.Code 1975. A putative father who complies with the PFRA is entitled to notice of adoption ¡proceedings under § 26-10A-17, Ala.Code 1975, and his consent generally is required to effectuate an adoption under § 26-10A~7(a)(5), However, if á putative' father does not comply' with the PFRA, both § 26-10(3-1 and § 26—10A—9(a)(5), Ala.Code 1975, provide that the father thereby impliedly and irrevocably consents to the adoption of the child. ’
In this casé, it is undisputed' that the father did not file a notice of intent to claim paternity in compliance with the PFRA. However, he maintains on’ appeal that he was prevented from filing the notice within 30 days after the birth of the child because the mother misrepresented that the child had died shortly after his birth. The undisputed evidence at trial showed that the mother gave birth to the child at a Mobile hospital while the father was away for work in Gulf Shores. The mother concealed the birth of the child from the father, and, after several days, she misrepresented to the father that the child had died shortly after his birth and that she was going to have the remains of the child cremated,' going so far as to produce a fake death certificate to support her lie. The mother testified that she then coaxed the father into moving to Colorado by saying she and their other child would follow; however, she admitted that she had had no intention of joining the father in Colorado. The father testified that, in August 2013, an attorney for the Alabama Department of Human Resources.had telephoned him and had asked for his consent to the adoption of the child, which, the father said, was how he had found out that the child was alive.
During the trial, the father’s counsel began to question the mother about whether she had misrepresented the death of the child in order to prevent the father from registering with the Putative Father Registry. The petitioners’ counsel objected, stating, among other things: “That’s not why we’re here.” The probate court overruled the objection, but admonished the father’s counsel to stay focused on the only issue before the court—the existence vel non of a common-law marriage. The father did not further raise or argue the point that he now maintains on appeal, i.e., that his failure to register under the PFRA should be excused by the mother’s misconduct. The probate court did not address that contention in its judgment because that contention was not properly raised in the proceedings below. The record does not contain any mention of the legal argument that the father now makes for the first time on appeal. We therefore conclude that the father did not preserve this argument for appellate review. See Bevill v. Owen, 364 So.2d at 1203.
IV. The Constitutional Claim
Finally, the father argues that his due-process rights have been violated by the probate court’s decision not to consider his objection to the adoption.[2] At the close *773 of the trial, the father’s attorney argued as follows:
“I would like to make the argument that under the Fourteenth Amendment, under these facts where you have a father who has supported the mother and the child, has - been a responsible father, even if Your Honor finds that he is not a common law spouse, to deprive him of his fundamental right of .parentage would violate the Fourteenth Amendment, due process clause.”
The father cited caselaw from the United States Supreme Court recognizing the fundamental rights of parents to the custody of their natural children, see Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and that, when an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his custodial right to object to the adoption of his natural child is entitled to substantial protection. See Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); see also M.V.S. v. V.M.D., 776 So.2d 142 (Ala.Civ.App.1999). The father’s attorney argued that the father, if deemed a responsible father based on his prebirth conduct, “does not merely have the right to contest the adoption,'he has the right to be involved in the [child’s] life. He has the fundamental right to make decisions-regarding the care, custody, and control of [the -child].... ” The probate court rejected the father’s constitutional arguments, finding that his due-process rights had been adequately protected and that the appellate courts had already determined that the PFRA was constitutional. See M.V.S. v. V.M.D., supra (rejecting Equal Protection Clause challenge to the PFRA). We conclude that the father preserved his constitutional challenge by properly raising it before the probate court and' receiving an adverse ruling.[3] See Alabama Power Co. v. Turner, 575 So.2d 551, 553 (Ala.1991) (“In order for an appellate court to review a constitutional issue, that issue must have been raised by the appellant and presented to and reviewed .by the trial court .... Additionally, in order to. challenge the constitutionality of. a statute, an appellant must identify and make specific arguments regarding what specific rights it claims have been violated.”).
The Fourteenth Amendment to the United States Constitution provides, in part, that “[n]o State.shall ,.. deprive any person of life, liberty, or property, without due process of the law.,... ” .
“We have long recognized that the [Fourteenth] Amendment’s Due Process Clause, like its Fifth Amendment counterpart, ‘guarantees more than fair process.’ Washington v. Glucksberg, 521 U.S. 702, 719 (1997). The Clause also includes a substantive component that ‘provides heightened protection against government interference with certain fundamental rights and liberty. interests.’ Id., at 720; see also Reno v. Flores, 507 U.S. 292, 301-302 (1993).”
Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). The interests of parents in the *774 custody, care, and control of their natural children has long been regarded as a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment. See Meyer v. Nebraska, 262 U.S. 390, 399 and 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In a series of cases, the United States Supreme Court addressed the nature of the constitutional rights of an unwed father. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court held that an unwed father, who has sired and raised his children, has a basic human right to the children’s custody of which he may not be deprived by the state without a hearing and an individualized determination of his unfitness. In Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), the Supreme Court held that the due-process rights of an unwed father, who had never exercised custody of his child and who had “never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child,” 434 U.S. at 256, were not violated when a court denied his objection to the adoption of his child by the child’s stepfather based on the best interests of the child. In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Supreme Court held that an unwed father, who had admitted his paternity and had established a substantial relationship with his children by living with them and participating in their care and support, was entitled to the same rights as an unwed mother to consent to an adoption of the children.
In Lehr, supra, the Supreme Court summarized its easelaw on the subject:
“When an unwed father demonstrates a full commitment to' the responsibilities of parenthood by com[ing] forward to participate in the rearing of his child,’ Caban[ v. Mohammed], 441 U.S. [380], at 392 [ (1979) ], his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he ‘act[s] as a father toward his children.’ Id., at 389, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. ‘[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in “promot[ing] a way of life” through the instruction of children as well as from the fact of blood relationship.’ Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844 (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233 (1972)).
“The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings, of the parent-child relationship and make uniquely valuable contributions to the child’s development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child’s best interest ] lies.”
463 U.S. at 261-62 (footnotes omitted). The Supreme Court held that, when a state adequately protects an unwed father’s opportunity to develop his inchoate relationship with his child, the state does not deprive the unwed father 'of due pro *775 cess. 463 U.S. at 262-64. In denying the unwed father’s constitutional challenge to New York state law, the Supreme Court emphasized that the unwed father had “never had any significant custodial, personal; or financial relationship with [his child], and he did not seek to establish a legal tie until after [his child] was two years old.” 463 U.S. at 262. By that time, the child at issue had already established a family relationship with the child’s mother and stepfather. Id.
Lehr and its predecessors transformed prior adoption law that had given little to no recognition of the rights of unwed fathers. Ardis L. Campbell, Rights of Unwed Father to Obstruct Adoption of His Child by Withholding Consent, 61 A.L.R.5th 151 (1998). Supreme federal law now clearly holds that a biological father who has not married the mother of his child, but who has otherwise acknowledged his paternity and developed a committed parental relationship with the child, must be treated the same as a presumed father with the right to object to the adoption of the child. Lehr, supra. The United States Supreme Court has never considered the impact of that reasoning on a commonly recurring scenario-r-when a mother immediately places a newborn child for adoption by strangers. Tiffany N. Godwin, Does Father Know Best? Arkansas’s Approach to the “Thwarted” Putative Father, 67 Ark. L.Rev. 989, 990 n. 14 (2014). Obviously, in such cases, a father will not have interacted with the child in many of the ways that evince a committed paternal intent and exemplify the kind of familial relationship with the child cited in Stanley and Caban. However, “ ‘ “[d]ue process,” unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.’ ” Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (quoting Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). “[D]ue process is flexible and calls for such procedural protections as the particular situation demands.” Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Constitutional law has adapted to this situation by holding that the state cannot deprive an unwed father of his substantive “opportunity interest” in gaining custody of his child without due process. Appeal of H.R., 581 A.2d 1141, 1144 (D.C.1990).
In an' influential law-review article, Professor Elizabeth Buchanan wrote that, under Lehr, “the state may not deny biological parents the opportunity to establish a protected custodial relationship.” Elizabeth Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson, 45 Ohio State L.J. 313, 351 (1984). This “opportunity interest',” as she labeled it, id. (citing Lehr, 463 U.S. at 262), includes the right of a fit biological father to engage with his child so' that he can form the lasting emotional and other bonds upon which full parental rights rest. 45 Ohio St. L.J. at 351-52. According to Professor Buchanan, the opportunity interest of an unwed father depends on the strength and promptness of his commitment to his potential relationship with his child. Id. at 357. Hence, an unwed'father who has immediately and continuously resolved to parent his child should be allowed to démonstrate that conviction to the state. Id. If the state denies an unwed father with an established commitment to his child the opportunity to develop a significant parental relationship with his child, that state action violates the Due Process Clause of the Fourteenth Amendment. Id. at 361. In the present context, *776 a state acts unconstitutionally when it deprives a sufficiently committed and otherwise fit unwed father an opportunity to develop a full parental relationship with his child by facilitating the adoption of the child by strangers without the unwed father’s consent. Id. at 368-69. “[T]he [natural] father’s opportunity to establish a protected relationship [with his child] must prevail in the absence of his unfitness.” Id. at 373.
The California Supreme Court relied on the “opportunity interest” when it determined that a newborn child of an unwed father could not be adopted unless awarding custody to the unwed father would be detrimental to the child. In re Baby Girl M., 37 Cal.3d 65, 688 P.2d 918, 207 Cal. Rptr. 309 (1984), superseded by statute on other grounds as stated in Adoption of Kelsey S., 1 Cal.4th 816, 823 P.2d 1216, 4 Cal.Rptr.2d 615 (1992). The Idaho Supreme Court concurred with Professor Buchanan that the constitution protects an unwed father’s “opportunity interest” from adverse state action. In re Petition of Steve B.D., 112 Idaho 22, 730 P.2d 942 (1986) (concluding that an unwed father had not timely acted to pursue a relationship with his child, so he had voluntarily lost his opportunity interest without state action), in In re Baby Girl Eason, 257 Ga. 292, 358 S.E.2d 459 (1987), superseded by statute on other grounds as stated in Clark v. Wade. 273 Ga. 587, 544 S.E.2d 99 (2001), the Georgia Supreme Court relied on Professor Buchanan’s article when stating:
“[U]nwed fathers gain from their biological connection with a child an opportunity interest, to develop a relationship with their -children which is constitutionally protected. This opportunity interest begins at conception and endures probably throughout the minority of the child.”
257 Ga. at 296, 358 S.E.2d at 462. The Surrogate’s Court of New York essentially read the “opportunity interest” into New York’s adoption code by requiring courts to gain the consent to adoption of unwed fathers who had proven a commitment to their children. In re Adoption of Baby Girl S., 141 Misc.2d 905, 912, 535 N.Y.S.2d 676, 680 (N.Y.Sur.Ct.1988). In In re Adoption of John Doe, 543 So.2d 741 (Fla. 1989), the Florida Supreme Court declared that an unwed father who had failed to avail himself of his opportunities to act as a parent toward the child before the child’s birth had thereby abandoned his child, losing his right to object to the adoption of his child; however, the court remarked that, if the unwed father had financially supported the child and the mother of the child and had taken other reasonable steps to solidify his relationship with his unborn child, those circumstances could have factored into a determination that he had a constitutionally protected right to object to the adoption.
In 1990,- Louisiana’s private-adoption laws allowed an unwed mother to surrender her child for adoption without the' consent of an unwed father whose name did not appear on the child’s birth certificate and further provided that the unwed father could not place his name on the child’s birth certificate without the mother’s consent. • Thus, an unwed mother who refused to allow an unwed, father to place his name on a child’s birth certificate could unilaterally give up her child for adoption. The Louisiana Supreme Court determined that the private-adoption scheme violated the due-process rights of a fit, fully committed unwed father of a newborn child who, if he has taken concrete actions to come forward to participate in the rearing of the child and if he has taken some measure of responsibility to make valuable contributions to the future welfare of the child, “has a constitutionally protected interest in his opportunity to develop a mutually beneficial emotional. or psychological bond *777 with his child.” In re Adoption of B.G.S., 556 So.2d 545, 550 (La.1990).
That same year, the New York Supreme Court relied on the “opportunity interest” of unwed fathers when it struck down a provision of the state’s adoption code pursuant to which an unwed father’s consent to the adoption of his under-six-month-old child was required only when he had openly lived with the child or the mother for six continuous months before the placement of adoption. In re Raquel Marie X., 76 N.Y.2d 387, 559 N.E.2d 418, 559 N.Y.S.2d 855 (1990). The court reasoned that the state “can prescribe conditions for determining whether the unwed father’s manifestation of interest in his child is sufficiently prompt and substantial to require full constitutional protection,” 76 N.Y.2d at 404, 559 N.E.2d at 425, 559 N.Y.S.2d at 862 (citing Note, Unwed Fathers and the Adoption Process, 22 Wm. & Mary L.Rev. 85, 135-37 (1980)), but that the state cannot impose any absolute arbitrary conditions that would automatically terminate the opportunity interest of an unwed father. Because the “living together” requirement would have deprived unwed fathers with constitutionally protected interests of developing a full relationship with their children, the court determined that the statute containing that requirement was unconstitutional. 76 N.Y.2d at 407, 559 N.E.2d at 427, 559 N.Y.S.2d at 864.
In Appeal of H.R., supra, a per curiam decision, the District, of Columbia Court of Appeals held that a court must give preference to a fit unwed father who has grasped his opportunity interest over unrelated persons seeking to adopt the unwed father’s newborn child. In reaching that conclusion, Associate Judge Ferren, writing the main opinion, distinguished Lehr, in which. an unwed father had allowed his child to bond with the mother’s husband for the.first two years of the child’s life without taking any steps to form a “significant custodial, personal, or financial relationship” with the child or seeking “to establish a legal tie” to the child. Lehr, 463 U.S. at 262. Judge Fer-ren. noted that, in a third-party newborn-adoption case, a state actor, either a court or a government-sponsored child-placement agency, deprives an unwed father, of the opportunity to develop the necessary relationship with the child by placing the child, at his or her birth, with the prospective adoptive parents with whom the child has no established family relations. 581 A.2d at 1163. Relying heavily on Professor Buchanan’s analysis, Judge Ferren determined that
“when an unwed mother has relinquished her right to custody of a child at birth for adoption by strangers, the unwed father’s interest in developing a custodial relationship with his child is entitled to substantial constitutional protection if he has early on, and continually, done all that he could reasonably have been expected to do under the circumstances to pursue that interest.”
581 A.2d at 1162-63. In H.R., an unwed father had been informed that the mother of his unborn child had. undergone an abortion, By the time he learned that the mother had, in fact, carried the child to term, the state had placed the child with prospective adoptive parents, failing to advise the father of the adoption proceedings for the next 18 months. Judge Ferren determined that the father had not abandoned his opportunity to form a constitutionally protected substantial relationship with his child but that the state had unlawfully interfered with that opportunity. 581 A.2d at 1172. Judge Ferren agreed that, under those circumstances, a fit unwed father should be entitled to a presumptive right .to custody as against the, prospective adoptive, parents unless clear and convine- *778 ing evidence proved that parental custody would actually harm the- child. 581 A.2d at 1173-80.
In Adoption of Kelsey S., supra, the California Supreme Court held that the father of a child born out of wedlock may not be denied the right to withhold his consent to his child’s adoption by third parties when he has made diligent and legal attempts to obtain custody of his child and to rear the child himself, absent any showing of the father’s unfitness as a parent. The evidence in the case showed that, during' her pregnancy, the mother had blocked all of the father’s attempts to receive the child into his home, thereby preventing him from acquiring'the'status of a presumed father under California law. As merely a putative father, the unwed father did not have a statutory right similar to that of the mother or of a presumed father to object to the adoption of the child. The lower court could, and did, authorize the adoption of the child based solely on its determination that adoption served the best interests of the child. The California Supreme Court held that an unwed father who “promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise—” has a “federal constitutional right to due process” that “prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.” 1 Cal.4th at 849, 823 P.2d 1216 at 1236, 4 Cal.Rptr.2d at 635. The court held that the state may not rob an unwed father of his constitutional right by requiring that the father marry the mother or receive the child into his home, both circumstances' that would be within the control of the mother. 1 Cal.4th at 847, 823 P.2d 1216 at 1235, 4 Cal.Rptr.2d at 634. See also Abernathy v. Baby Boy, 313 S.C. 27, 437 S.E.2d 25 (1993) (unwed father who had made sufficient prompt and good-faith attempts to financially support unwed mother and their unborn child during pregnancy had constitutional right to object to adoption of child despite inability to comply with literal requirements of prenatal-support provisions in South Carolina’s adoption code due to unwed mother’s refusal to accept financial support). Other state courts have agreed that, notwithstanding any state law to the contrary, an unwed father who has grasped the opportunity to establish a relationship with his child retains the right to withhold his consent to an adoption. See, e.g., Walker v. Campbell, 711 N.E.2d 42 (Ind.Ct.App.1999), opinion vacated after settlement, Walker v. Campbell, 719 N.E.2d 1248 (In.1999); In re Hood, 930 S.W.2d 575, 578-79 (Tenn.App.1996) (statute that permitted mother to make adoptive placement without putative father’s consent violated putative father’s substantive due-process rights); Wade v. Geren, 743 P.2d 1070, 1073 (Okla.1987) (putative father’s substantive due-process rights attached when he had expended great amount of time, effort, and resources to take on the responsibility for rearing the child and for having the opportunity to develop an emotional bond with the child).
This court first discussed the “opportunity interest” established by Lehr in M.V.S. v. V.M.D., supra. In that case, the father, a 43-year-old man married to another woman, impregnated the 18-year-old mother during an illicit affair. After the mother refused to consent to an abortion, the father ended the relationship and discontinued all financial assistance to' the mother. The mother gave birth to the child and acted as the child’s sole custodian for nine months before consenting’ to the adoption of the child by a third party. During those nine months, the father saw the child on three occasions, never treating the child lovingly, and gave the mother a *779 gift of $1,765, but he took no actions to establish his paternity or legal relationship to the child, filing a custody petition only after learning of the adoption of the child. This court agreed with the trial court’s determination that the father had failéd to establish any parental commitment or substantial relationship with the child, thereby relinquishing any claim to a substantive due-process right to be treated as the father of the child. 776 So.2d at 146-48. This court also rejected the father’s equal-protection challenge to the PFRA but indicated that the outcome might have been different had the father established a substantial relationship with the child. 776 So.2d at 150 (citing Walker v. Campbell, 711 N.E.2d 42 (Ind.Ct.App.1999), opinion vacated after settlement, Walker v. Campbell, 719 N.E.2d 1248 (Ind.1999) (holding that unwed father who made regular and substantial child-support payments and who had exercised and attempted to exercise visitation rights with child had constitutional right to object to adoption of child despite noncompliance with Indiana’s Putative Father Registry Act, which could not be constitutionally applied)).
Since M.V.S., all of this court’s cases citing Lehr approve of the concept that the constitution protects an unwed father who has cultivated a substantial relationship with his child. See, e.g., R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002); K.D.T.J. v. Madison Cnty. Dep’t of Human Res., 867 So.2d 1136 (Ala.Civ.App.2003); K.H.M. v. D.L.I., 895 So.2d 950 (Ala.Civ.App.2003); see also M.M. v. D.P., 10 So.3d 605, 608-10 (Ala.Civ.App.2008) (Bryan, J., dissenting); J.L.P. v. L.A.M., 41 So.3d 770 (Ala.Civ.App.2008) (Bryan, J., concurring in the result); R.S. v. R.G., 995 So.2d 893, 904-06 (Ala.Civ.App.2008) (Moore, J., concurring in the result); cf. C.C. v. L.J., 176 So.3d 208, 215 (Ala.Civ.App.2015) (“Based on the reasoning in Lehr, an unwed father who voluntarily, inténtionally, and unjustifiably fails or refuses to assume a parental role is not entitled to the constitutional protection afforded by the Due Process Clause. See J.B. v. Jefferson Cnty. Dep’t of Human Res., 869 So.2d 475, 483 n. 7 (Ala.Civ.App.2003) (plurality opinion) (citing Lehr and noting that a natural father who has abandoned his child and who has not forged a substantial relationship with his child thereby loses due-process and statutory rights normally associated with the parent-child relationship).”). Our supreme court also implied' agreement with that principle of constitutional law in Ex parte J.W.B., 933 So.2d 1081 (Ala.2005), when it determined that an unwed father who had not developed a substantial prenatal or postnatal relationship with his child had abandoned the child so that his consent to adoption was not required. 933 So.2d at 1092 (citing K.W.J. v. J.W.B., 933 So.2d 1075, 1080-81 (Ala.Civ.App.2005) (Murdock, J., dissenting), citing in turn Lehr, supra).
In this case, the father argues that he had demonstrated the requisite commitment to fatherhood before the birth of the child such that he retained a constitutional right to object to the adoption of the child by the petitioners regardless of the operation of the PFRA or the AAC. The father testified that he and the mother had participated in consensual sex on multiple occasions after their divorce.[4] It was *780 undisputed that, in September or October 2012, the mother conceived.the child with the father at his apartment. The father testified that he had attended some of the mother’s prenatal appointments and had paid for two of the prenatal, visits in April 2013. The father testified that he and the mother had decided on a name, .for the child and that they had hung the child’s ultrasound photo on the refrigerator in the father’s apartment. He testified .that, he had purchased clothes, teethers, and bibs for the child. It was undisputed that the mother and the father had announced the gender of the child to the father’s family at á softball game. The evidence was also undisputed that the father had' acknowledged his paternity of the child and was excited about the pending birth of the child. The mother testified that she hid the birth of the child from the father despite her knowledge that the father wanted to parent the child and was excited about that prospect.' The father testified that, when he learned that the child was alive, he immediately took a bus from Colorado to Alabama and hired a lawyer to contest the adoption.
Although a father cannot exercise custody of an unborn child gestating in its mother’s womb, a father still plays a role in the life of a developing, but unborn, child. See In re Raquel Marie X., supra. Our caselaw holds that a father, whether married to the mother or not, owes a duty to support his unborn child. See Ex parte C.V., 810 So.2d 700 (Ala.2001) (plurality opinion). Thus, an unwed father may establish his commitment to, and parental relationship with, ah unborn child by providing prebirth support to the child commensurate with his means.[5] Id. A father may also show that he has seized his opportunity to parent a child through other unequivocal prenatal conduct showing that the father has and will discharge his other parental responsibilities to and for the child. See In re Adoption of Baby Boy B., 394 S.W.3d 837 (Ark.2012); see also Dara E. Purvis, The Origin of Parental Rights: Labor, Intent, and Fathers, 41 Fla. St. U.L.Rev. 645, 681 (Spring 2014) (listing examples of ways, in which unwed fathers can evince a clear intent to act as a father to an unborn child). Extrapolating the reasoning from Lehr, if a man promptly and consistently acts as a father toward his unborn child, he has a “constitutionally protected interest in his opportunity to develop a mutually beneficial emotional or psychological bond with his child” after the child’s birth that cannot be denied him through state action. In re Adoption of B.G.S., 556 So.2d at 550. If an unwed mother thwarts the ability of the father to further develop his parental relationship after the birth of the child, her misconduct does not diminish the rights, of the unwed father as already established through his prebirth conduct. See In re Adoption of Baby Boy B., supra; Adoption of Kelsey S., 1 Cal.4th at 849, 823 P.2d at 1236, 4 Cal.Rptr.2d at 635 (holding that California’s adoption scheme violates due-process rights of unwed fathers by allowing “a mother unilaterally to preclude her child’s biological father from becoming a ‘presumed father and thereby allowing the state to terminate his parental fights on nothing more than a showing of the child’s *781 best interest”); In re Petition of Kirchner, 164 Ill.2d 468, 487-88, 649 N.E.2d 324, 333, 208 Ill.Dec. 268, 277 (1995), overruled on other grounds, In re R.L.S., 218 Ill.2d 428, 300 Ill.Dec. 350, 844 N.E.2d 22 (2006) (discussing “an unwed father’s rights regarding an infant placed for adoption at birth who seeks to raise his child but is prevented from doing so through deception” and announcing that “fathers ... whose parental rights are not properly terminated and who, through deceit, are kept from assuming responsibility for and developing a relationship with their children, are entitled to the same due process rights as fathers who actually are given an. opportunity and do develop this relationship”); Appeal of H.R., supra; Kessel v. Leavitt, 204 W.Va. 95, 511 S.E.2d 720 (1998); see also David D. Meyer, Family Ties: Solving the Constitutional Dilemma of the Faultless Father, 41 Ariz. L.Rev. 753 (1999).
Because of the disputes in the evidence, we cannot hold that the'father proved his constitutional claim as a matter of law. We hold only that it is apparent that, in rejecting the father’s constitutional arguments, the probate court did not determine whether the father had grasped his constitutionally protected “opportunity interest” by his prebirth conduct toward the mother and the child and his postbirth actions to protect his legal relationship with the child. Thus, we reverse the judgments and remand the case to the probate court for it to make that fact-sensitive determination. We instruct the probate court, on remand, to consider any indicia of the unwed father’s commitment to the child or lack thereof, including, but not limited to,, the manner in which the child was conceived; any expressions by the unwed father toward or regarding his unborn child, or his role as a parent to that child; the openness and consistency of the unwed father’s acknowledgment of paternity of the unborn child; - the measure of the financial, emotional, and other support and care provided, to the mother and the child by the unwed father during the mother’s pregnancy and the promptness and continuity of that support; the sincerity of any attempts by the unwed father to stabilize his relationship with the mother and to legitimate the child through marriage or other means; any manifestations of the unwed father’s intent as to future parental involvement with the child; any harm the unwed father may have caused his unborn child or the mother through any act or omission; any failure by the unwed father to follow statutory -safeguards or to take legal action designed to protect his parental interest, in the child before birth and the reasons therefor; any efforts -by the unwed father to pursue and protect a legal or actual parental relationship with the child after birth; and any actions taken by the mother intended.to thwart the unwed father’s opportunity to develop a parental relationship with the child after birth and the reasonableness of the unwed father’s conduct in attempting to overcome those actions. See Appeal of H.R., supra.
Because the probate court limited its earlier- inquiry solely to the question of whether the child was born of a common-law marriage between the mother and the father, the probate court may, if requested, hold an additional evidentiary hearing regarding the father’s constitutional claim. However, to forestall further protracted proceedings in this case, the probate court shall conclude its fact-finding duties and issue a judgment on the father’s constitutional, claim within 30 days of the date the probate court is - reinvested with jurisdiction in this case. Any determination the probate court makes as to the father’s constitutional claim shall contain written findings of fact and conclusions of law to expedite any further appellate review.
*782 Conclusion
Based' on the foregoing, we reverse the judgments of the probate court and remand this case for further proceedings in accordance with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMAS, J., concurs.
PITTMAN, J., concurs in the result, without writing.-
DONALDSON, J., concurs in part and dissents in part, with writing, which THOMPSON, P.J., joins.

. Although the parties and the probate court referred to the judgment as a judgment as a *767 matter of law, because this action was tried without a jury, the judgment is more properly referred to as a Rule 52(c), Ala. R. Civ. P., judgment on partial findings. See Lawson v. Harris Culinary Enters., LLC, 83 So.3d 483, 490 n. 7 (Ala.2011).

. The petitioners argue that the father waived this argument by failing to serve the attorney general in tills action; .We-interpret the father’s argument as an "as applied” challenge, which does not require service on the attorney general. See IEC Arab Alabama, Inc. v. *773 City of Arab, 7 So.3d 370, 377-78 (Ala.Civ.App.2008).

. The father raised other constitutional challenges, but, on appeal, he argues only that the judgment of the probate - court violates his due;-process rights under the federal constitution. Hence, we consider those other arguments raised before the probate court, but not argued on appeal, to be waived, and we'do not address them in this opinion. See Curvin v. Curvin, 6 So.3d 1165 (Ala.Civ.App.2008).

.- The mother testified that she had not consented to any of their sexual encounters. The constitutional protections outlined in Lehr and its progeny do not extend to unwed fathers who produce a child out of wedlock through nonconsensual sexual intercourse with the mother. See Adoption of Kelsey S., 1 Cal.4th at 849 n. 14, 823 P.2d at 1237 n. 14, 4 Cal.Rptr.2d at 636 n. 14; Kessel v. Leavitt, 204 W.Va. 95, 125 n. 30, 511 S.E.2d 720, 750 *780 n. 30 (1997). On remand, the probate court can resolve the conflicts in the testimony as to the manner in which the child was conceived.

. Section 26-10A-9(a)(i), Ala.Code 1975, impliedly recognizes that duty by providing 'that consent to adoption is not required' from a father who fails, “with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.” See Ex parte F.P., 857 So.2d 125, 143 (Ala.2003) (Stuart, J., dissenting).