PARKER, Justice
(dissenting).
The goal of providing finality and stability for a child should not be obtained at the expense of a biological father’s legal and God-given natural rights, especially by means of judicially condoned lies and deception, as' occurred in this case. For that reason; I join Justice Murdock’s dissent.
MURDOCK, Justice
(dissenting).
. I respectfully dissent based on the following:
(1) D.W., the natural father in this case (“the father”), did as much or more than the law expected of him in holding him *793 self out to the public as the father of the unborn child, B.W.B. (“the child”)» providing pre-birth support of both the child and.JJB. (“the mother”) and demonstrating his commitment to serve as the child’s father after the child’s birth.
(2) The mother knew who the natural father was and that he would claim his rights as the father if he was aware of the adoption proceeding, and yet she refused to disclose the father’s identity in the adoption proceedings.
(3) The mother lied to the father, telling him that the child died shortly after birth. The father did not learn the truth that the child had survived until after the time to register under the Putative Father Registry Act, § 26-10C-1 et seq., Ala.Code 1975 (“the PFRA”), had expired, at which point the father ■acted almost immediately to pursue his rights.
(4) The adoptive parents filed and pursued their petition with an awareness that the mother knew who the father was and that he might contest the adoption and that the mother was refusing to disclose the father’s identity, thus, depriving the father of legal notice of the adoption petition. •
(5) Under these facts, depriving the.father of his rights as the child’s natural father based solely on the fact that he did not register sooner under the PFRA violates the father’s substantive due-process right under the 14th Amendment.
(6) The father adequately preserved this issue for appellate review.
I. The Facts
The father was greatly involved with and supportive of both the mother and child during the mother’s pregnancy. In fact, based on the record before us, it might be said that it was in “textbook fashion” that the father held himself out as the father of the child and gave support to the mother during the pregnancy.
The father and mother were married until about 12 months before the birth of the child. The father and mother already had one child together, who was born during their marriage and whom both of them were parenting. The father and mother attended church and other events together during the mother’s prégnancy. Other important facts, regarding the,father’s support of the child and the mother are set out in the lead opinion in the Court of Civil Appeals:
“In this case, the father argues that he had demonstrated the requisite commitment to fatherhood before the birth of the child such that he retained a constitutional right to object to the adoption of the child by the petitioners regardless of the operation of the PFRA or the [Alabama Adoption Code], The father testified that he and the mother had participated in consensual sex on multiple occasions after their divorce. It was undisputed that, in September or October 2012, the mother, conceived the child with the father at his apartment. .The father testified that he had attended some of the mother’s prenatal appointments and had paid for two of the prenatal visits in April 2013. The father testified that he and the mother had decided on a name for the child and that they had hung the child’s ultrasound photo on the refrigerator in the father’s apartment. He testified that he had purchased clothes, teethers, and bibs for the-child. It was undisputed that the mother and .the father had announced the gender of the child to the father’s family at a softball game. The evidence was also undisputed that the father had acknowledged his paternity of the child and was excited about the pending birth of the child.. The mother testified that *794 she hid the birth of the child from the father despite her knowledge that the father wanted to parent the child and was excited about that prospect. The father testified that, when he learned that.the child was alive, he immediately took a bus from Colorado to Alabama and hired a lawyer to contest the adoption.”
D.W. v. J.W.B., 230 So.3d 763, 779-80 (Ala.Civ.App.2015) (footnote omitted).
The mother did not indicate that the father was unknown. Instead, she indicated, in conjunction with J.W.B. and J.J.B.’s petition for adoption, that the father was known, but that she was refusing to disclose who he was.[6] 'It was to the advantage of the mother, and to the chances of success of the petition filed by J.W.B. and J.J.B., that the mother riot identify the father to the probate court. Section 26-10A-17(a)(10), Ala.Code' 1975, requires that notice of an adoption petition be given to “[t]he father and putative father of the adoptee if made known by the mother or otherwise known by the court unless the court finds that the father or putative father has given implied consent to the adoption, as defined in' Section 26-10A-9.”[7] (Emphasis added.) Section 26-10A-17(a)(10) clearly requires notice to “the father,” i.e., the biological father of a child, unless' the father has impliedly consented to the adoption. (And, as noted below, the father in the present case had not impliedly consented to the adoption of his child when J.W.B. and J.J.B. filed their adoption petition.) Section 26-10A-17(a)(10) does not authorize the withholding of information as to the identity of a father from the court so as to deprive that father of notice of a pending adoption petition concerning his child. As the comment to § 26-10A-17, Ala.Code 1975, confirms, the mother’s averment that a father is “unknown” is intended for situations where the father is unknown to the mother, not to allow a mother to intentionally conceal the identity of a known father, particularly one who has expressed an interest in being a father, in order to facilitate an adoption without notice to the father and without his consent. The comment states that, “under § 26-10A-10(6), the consent of the natural father is not required when the mother indicates that the natural father is unknown, unless the natural father is otherwise made known to the court.” Comment to § 26-10A-17 (emphasis added).[8]
Again, the father in'the present case was not unknown, and the mother did not indicate that he was unknown. Instead, she refused to disclose the identity of the father. J.W.B. and J.J.B. knew they were advantaged by that refusal because it meant that the father would not receive notice of the adoption petition before his implied consent might be conclusively presumed. „
Further, § 26-10A-9, Ala.Code 1975, a part of the Alabama Adoption Code, states:
*795 “(a) A consent or-relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
[[Image here]]
“(5) Failing to comply with Section 26-100-1.
“(b) Implied consent under subsection (a) may not be withdrawn by any person.”
Again, attention to the facts in the present case is vital to understanding the application of the foregoing provision. A father may comply with § 26-10C-1, Ala.Code 1975, by filing with the putative-father registry at any time “within 30 days of the birth of a child bom out of wedlock.” As of the date of the filing of the adoption petition in the present case, the father had not failed to comply with § 26-10C-1; the father still had 28 days to file with the registry.[9] And, because the father still could have complied with the filing requirement, his “consent” could not have been implied as of the date J.W.B. and J.J.B. filed their petition. And it is that fact that explains why it was important to avoid revealing the father’s identity. Not “disclosing” the identity of a known father to the probate court made it possible to avoid giving the father the notice that would have allowed him to timely exercise his rights. And, under the facts before us, there is no doubt that the father would have timely exercised his right to file with the putative-father registry to protect his rights to his child. And not only do his actions confirm that fact, but the mother’s actions in concocting her deceit as to the child’s death confirms that .she believed the father was seriously interested in pursuing his relationship with his child' and would not be in favor of the adoption.
It is undisputed that the mother deceived the. father as to his child’s death, thus depriving him of any possible perception of the need to file with the putative-father registry. And, though I am not at all suggesting the adoptive parents share the. mother’s guilt as to the fraud she committed against the .father, the adoptive parents nevertheless knew that the father was not “unknown” when they filed their petition.
Likewise, it is undisputed that the father timely sought to contest the adoption petition as soon as he became aware that his child had not in fact died soon after birth. But he was not informed that he had a living child until a few days after he could no longer file with the putative-father registry. The father had no reason to file with that registry until he discovered the mother’s fraud.
And, perhaps as important, an even greater appreciation by the adoptive parents of the risk that this particular adoption might be challenged was revealed only about two weeks after the July 17, 2013, deadline for filing with the putative-father registry (as noted, the child was born on June 17, 2013). On August 5, 2013,—11 days before the father filed his contest to the adoption—the adoptive parents filed a motion for'a protective order, which stated: '
“The [adoptive parents] ... hereby request that this Court issue a Protective Order providing that their names not be disclosed in the Notice Of Adoption Hearing to be served on [the father] (the natural mother’s ex-husband to whom she applied to be remarried on March 22, 2013 right before the birth of the minor child on June 17, 2013). In support' of this Motion, the following matters are submitted.
*796 [[Image here]]
“2. The natural mother’s ex-husband .. will need to be' served with a Petitioner’s Notice Of Hearing because there is concern that they may' have become married, pursuant to their Certificate of Marriage application that was obtained on March 22, 2013. (See Certificate Of , Marriage application attached).”
In other words, the record reveals that, with the possible exception of the approximately two weeks between July 17, 2013,, and, August 5, 2013, J.W.B. and J.J.B. were aware that the father’s express consent to the adoption, not simply his implied consent, might be required.[10] And, based, on the father’s prompt filing of his contest to the adoption, his express consent clearly would have been required if the mother had not defrauded him and if J.W.B. and J.J.B. had not then joined her effort to keep the father’s identity from the probate court.[11] ■ :
XI. The Unconstitutionally of the PFRA as Applied in This Case
The facts before the probate court are deeply troubling.' The result achieved by the Court’s decision.today is to leave undisturbed the adoption of a child, and a concomitant termination of a natural father’s parental rights, made possible by (1) a conspiracy of silence as to the identity of the father, who was known to the mother, and who had done a great deal to support both the' mother and the child before the birth of the child and undisputedly had demonstrated a commitment to fulfilling his duties as a father; and (2) the use of the state court system to help defraud this known father of his right to withhold consent to the adoption of his child, And this result, is achieved even though the father (1) contested the adoption based on allegar tions that 'he has been the victim of fraud and has not consented to the adoption as required by law and (2) filed his contest as soon as' he discovered the fraud—indeed within days’after he would have had an absolute-veto' over the adoption had he not been defrauded—and well before the-probate court had entered a final judgment as to the adoption. If what the father in this case received represents due process of law, then I ■ submit not much process is due. But I reject the notion - that the father received all the'process he was due. *797 I am compelled instead to conclude that the application of the statutes at issue here unconstitutionally deprived the child’s father of his rights as the 'child’s, father.
Specifically, I note that the child was born on June 17, 2013. As of that date, under the law, two persons, the mother and the father, each had a right to custody of their child. Likewise, as of that date, under the law, no adoption of the mother’s and the father’s child thereafter could be allowed without the express consent or implied consent of both the mother and the father.[12]
As to the father’s rights, I note that the PFRA does not purport to affect the right of a natural father to contest the adoption of his child until the expiration of 30 days after the child’s birth:
“(i) Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to subsection (a) prior to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption'proceeding.
“This subsection shall be the exclusive procedure available for any person who claims to be the natural father of a child born out of wedlock on or after January 1, 1997, to entitle that person to notice of and the opportunity to contest any adoption proceeding filed and pending on or after January 1,1997.’’
Ala.Code 1975, § 26-lOC-i (emphasis added). See also § 26-10A-9, Ala.Code 1975 (“A consent or relinquishment required by Section 26-10A-7 may be implied by ... (5) [flailing to comply with Section 26-10C-1.”); and Comment to § 26-10A-9, Ala.Code 1975 (“When it is not possible to obtain the actual consent of a person who is specified in section 26-10A-7, this section enumerates'instances in which "a person’s consent may be 'implied from his or her acts or omissions with réspect to his or her duty to care for the adoptee in the past.” (emphasis added)).[13]
The prospective adoptive parents filed their petition before the expiration of the 30-day period for filing with the putative-father registry. Thus, the petition was filed at a point when the father had not failed to file with the registry as contemplated by § 26-10C-T and at a point when he had not consented to the adoption and the concomitant termination of his own parental rights. On June 19, 2013, two days after the child’s birth, J.W.B. and J.J.B. filed their petition to adopt the child, with the cooperation and the consent of *798 the mother. The adoption petition includes allegations that the father was “unknown” and that the “Putative Father Registry will be utilized.” In addition to what is stated in the main opinion, however, there is this: Although the name of the father may have been unknown to the adoptive parents, they were aware when they filed the adoption petition that there was a natural father who may very well pursue his rights if given the opportunity and that the mother knew the identity of the father but was withholding that information from the court. The “Affidavit of Paternity” executed by the mother and filed by J.W.B. and J.J.B. with the adoption petition states:
“The biological father of the minor child ... born to me on June 17, 2013, ... is somebody whose identity I refuse to disclose. I am not currently married, having been divorced from [the father] on June 14, 2012. He is not somebody who held himself out as being the father of the baby or supported me during the term of my pregnancy.”
(Emphasis added.)[14]
Thus, this is not a typical case involving an unknown father. As discussed above, this is a. case where the adoptive parents were aware that the success of their adoption petition was tied to a silence they were relying on the mother to maintain in the hope that the father would not timely file with the putative-father registry. And the nature of that conspiracy is based on an erroneous interpretation and application of the notice and consent provisions of the Alabama Adoption Code, which has deprived the father of due process.
Primary among the questions presented in J.W.B. and J.J.B.’s petition is whether
“[t]he decision of the Court of Civil, Appeals is in conflict with the decision of the United States Supreme Court in Lehr v. Robertson, 463 U.S. 248 (1983) and its own decision in M.V.S. v. V.M.D., 776 So.2d 142 (Ala.Civ.App.1999). Each of these decisions holds that the enactment of a putative father registry provides constitutionally sufficient protection to the due process rights of biological fathers of children born out of wedlock.”
The issue as posed by J.W.B. and J.J.B. misstates the holding in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Lehr concerned only whether New York’s statutes governing its putative-father registry “adequately protected [John Lehr’s] opportunity to form ... a relationship” with his child. Id. at 263. But, more importantly, • unlike the putative father in Lehr, the father here not only had a previous record of support of the mother and child during the pregnancy, but also was actively defrauded by the mother in a way that deprived him of any awareness of the need to register with the putative-father registry. In fact, the Supreme Court expressly emphasized the importance of such a distinction in Lehr: “There is no suggestion in the record that appellee engaged in fraudulent practices that led appellant not to protect his rights.” 463 U.S. at 265 n. 23. Lehr un *799 equivocally does not support the- proposition that a putative-father-registry statute may be applied to further a fraud against a father, which is what happened -in the present case. There was in this case, in essence, a conspiracy of silence perpetrated against the father that was ignored by the probate court and that resulted in an unconstitutional application of the PFRA to the father.
III. The Father Preserved the Issue of the Unconstitutionality of the PFRA’s Application to These Facts
As to the issue posed by J.W.B. and J.B.B. that is addressed by the main opinion, i.e., the preservation-of-the-constitutional-argument issue, I disagree with the main opinion that the father failed to preserve for appellate review the issue whether the application of the PFRA to this case deprived him of due process. 230 So.3d at 791. The father could, and did, assert his right to due process as a natural father who had not abandoned either the child or the mother, but who in fact had supported them both during the pregnancy, and then sought the right to assert his paternal status during the adoption proceedings. And, the father alerted the probate court that his consent could not be implied under the facts of this case without violating his constitutional rights. The probate court expressly addressed that issue, and it ultimately relied upon the notion that its understanding and application of the statutes governing the putative-father registry and implied consent under the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, gave the father all the “due process” to which he was entitled. As noted above, that determination cannot be squared with the facts of this case, and neither can the main opinion’s conclusion that the father failed to adequately preserve the issue at hand.
On August 16, 2013, the father filed a “Motion to Contest Adoption” alleging:
“2. After the divorce, the mother and father cohabitated from August 2012 until October 2012. After separating, the mother notified the father she was pregnant.
“3. The father ' provided financial support to the mother during the course of pregnancy, providing a,nurturing relationship to her and his unborn child.
“4. The parents attempted to procure an official marriage in Mobile County Probate court but never procured the solemnization. They none the less held each other out as husband and wife durihg the course of the pregnancy.
“5. Although the child was born on June 17, 2013, the mother informed the father on June 21, 2013 that the child was dead providing, .a fake death certificate.
“6. The father moved to Colorado to .work after this event and was assured by the mother that she would be joining him. When this did not come to fruition, the father moved.back to Mobile, Alabama.
“7. At the end of July, 2013, the father was informed by Counsel Donna Ames the child was to be placed for adoption.
“8. The father is a presumed father [under] [§ ] 26-10A-7(a)(3)[, Ala.Code 1975]....
“9. [Section] 26-10A-7 requires the father’s consent or his relinquishment. Neither is given by the father.
“10. The father never abandoned the child as defined in [§ ] 26-10-9[, Ala. Code 1975,] because he provided support during the course of the pregnancy and left Mobile to work after being informed the child was dead.
*800 ‘ “11*' The father is entitled to notice under [§ ] 26-10A-7 as the father is known under [§ ] 26-10A-17L AIa.Code 19751.
“12. Under [§ ] 26-10A-25(d)[, Ala. Code 1975,] a final decree of adoption can be collaterally attacked in cases of fraud up to one year from the entry of the final decree and after all appeals, if any.”
(Emphasis-added.)[15]
In its pretrial-conference order entered October 10, 2013, the probate court noted that “the triable issues” at the hearing as to the father’s motion to contest the adoption were whether the father was a “presumed father” and “[wlhether or not [the father] has standing to file the contest to the adoption.”[16]
Thereafter, on December 17, 2013, J.W.B. and J.J.B. filed a motion to dismiss the father’s motion to contest the adoption, alleging that the father “did not register with the Alabama Putative Father Registry within thirty (30) days of birth and therefore has given an irrevocable implied consent to this adoption.”
The father filed an objection to the motion to dismiss, alleging in part that,
“[a]fter"the divorce, the mother and father cohabitated from August 2012 until October 2012. After separating, the mother notified the father she was pregnant. The father provided financial support to the mother during the course of the pregnancy, providing a nurturing relationship to her and his unborn child. The. parents attempted to procure an official marriage in Mobile County Probate court but never procured the solemnization. They. .none, the less held each other out as husband and wife dür-ing the course of the pregnancy, Although the child was born on June 17, 2013, the mother informed the father on June 21, 2013 that the child was dead providing, a fake birth certificate. The father moved to Colorado to work after this event and was assured by the mother that she would be joining him. When this did not come to fruition, the father moved back to Mobile, Alabama.
“At the end of July, 2013, the father was informed by Counsel Donna Ames the child was to be placed for adoption.”
(Emphasis added.) The father again restated the arguments he made in his motion to contest the adoption, namely that he was “a presumed father [under] [§ ] 26-10A-7(a)(3)” because he and the mother were married when the child was conceived or they had attempted to marry and the child was born within 300 days after cohabitation, and, in addition, that
“2. [Section] 26-10A-7 requires the father’s consent or his relinquishment. Neither is given by the father.
“3. The father never abandoned the child as defined in [§ ] 26-10A-9 because he provided support during the course of the pregnancy and left Mobile *801 to work after being informed the child was dead.
[[Image here]]
“5. The father is entitled to notice under [§ ] 26-10A-7 as the father is known under [§ } 26-10A-17.”
(Emphasis added.)
On February 17, 2014, after holding a hearing as to J.W.B. and JJ.B.’s motion to dismiss, the probate court entered an order denying the motion, but requiring the father to
“2.... DEPOSIT with the Court the sum of $10,000 on or before 1:00 o’clock p.m. on April 22, 2014, said sum to serve as a deposit for anticipated court costs and other expenses - that may become due and owing by [the father] pursuant to Ala.Code § 26-10A-24 (1975).
“3. If [the father] fails or refuses to timely post the deposit as provided herein, the Court will entertain the appropriate motion that [the father’s] objection to the adoption should be dismissed for failure to prosecute.”
(Capitalization in original.) But see Ala. Code 1975, § 26-10A-24(h) and (i) (providing for “reimbursement” to the petitioners for certain expenses where “the adoption is denied” and “the contest fails,” respectively).
The father failed to deposit $10,000 with the court. J.W.B. and J.J.B. filed a motion to dismiss the father’s adoption contest for nonpayment of the deposit. The probate court “conditionally denied” J.W.B. and J.J.B.’s motion, and further ordered the father to
“DEPOSIT with the Court the sum of $10,000 on or before 5:00 p.m. on May 30, 2014, said sum to serve as a deposit for anticipated court costs and other expenses that may become due and owing by. [the father]- pursuant to Ala.Code § 26-10A-24 (1976). It should be noted that no further continuance of this deadline will be granted. If the deposit is not timely made, the Court, without further notice or hearing, shall proceed to rule upon the Motion to Dismiss and Objection to Motion to Dismiss.”
(Capitalization in original.)
■Thereafter, the father filed a motion seeking a declaration of indigency and the appointment of counsel and requesting that the probate court vacate its order requiring the father to deposit $10,000. The father’s motion further allegéd, however, that
“he is the biological father of [the child] in this matter and as such pursuant to Ala,Code [1975,] § 26-10A-5[,] has an absolute veto power over the proposed adoption, but because of his indigency he has been- severely prejudiced and hampered by his inability to prosecute his claim to establish his paternity.” ■
In conjunction with the father’s drguments concerning his indigency and his right to appointed counsel, the father made “Federal & State Constitutional Arguments” that included the following:
“13. A parent has a fundamental liberty interest in the care, custody, and management of his or her child. See, e.g., Santosky v. Kramer[, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ]; Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); J.S. v. D.W., [835 So.2d 174] (Ala.Civ.App.2001).
[[Image here]]
“16. Further, [the father] maintains that he is the victim of a fraud perpetuated [sic] by the birth mother of the child, and therefore has not abandoned *802 •his child, nor has he impliedly consented to the adoption.”
(Emphasis added.)
On June 6, 2014,' the probate court denied the father’s request for a declaration of indigency. Á few days later, however, the probate court entered an additional order vacating its orders requiring the father to deposit $10,000 with the court as a precondition to its considering his motion to contest the adoption. Thereafter, J.W.B. and J.J.B. filed, a motion for a summary judgment on the issue of the alleged common-law marriage between the father and the mother. The .father opposed the motion.
On July 28, 2014, the probate court entered an order denying J.W.B. and-J.J.B.’s motion for .a summary judgment , and setting the case for trial. The order stated:
“6. The triable issues in this cause identified at this time are:
“a. Whether [the father] is a ‘presumed father’ for purposes of the Alabama Adoption Code, which centers on whether [the father] was the common law spouse of ... the birth mother, at the time of the birth of [the child].
“b. Whether or not [the father] has standing to file the opposition to the adoption of [the child].
“c. Whether or not [the father] has impliedly consented to the proposed adoption.
“d. Whether the adoption of [the child] should be granted.”
On August 15, 2014, the probate court entered an order again addressing its deposit orders, which had been vacated, and the father’s motion to be declared indigent. In its “Findings of Fact,” the probate court stated:
“2. [The father] asserts that [he] is the presumed father of the [the child] because [the father] asserts that [he] and the mother of the [child] were married (by common law) at the time of the [child’s] birth. [The father] objects to the Petition For Adoption.
“3. It is undisputed that [the father] did not register with the Alabama Putative Father Registry in accordance with § 26-10C-1.
“4. If [the father] is not determined to have been married to the [child’s] biological mother at the time of the [child’s] birth, [the father] lacks standing to contest the proposed adoption.”
(Emphasis added.)
In addition to the foregoing, at trial, in the face of a court hostile to his even presenting his constitutional arguments, the father
(1) specifically invoked both procedural .and substantive due process “‘under these facts,’ ”
(2) specifically referenced the “ ‘state statute’ ” being applied to him,
(3) specifically referenced and made arguments as to pertinent precedents, including Lehr, supra, and
(4) specifically argued that his “‘relationship acquire[d] ... substantial protection under the due process clause of the Fourteenth Amendment to the United States [Constitution].’ ”
230 So.3d at 788 (quoting, where indicated, the trial transcript).
It is clear that the probate court considered the issues before it to go beyond the question whether the parties had a common-law marriage and to include whether the father’s failure to register with the putative-father registry foreclosed his ability to assert his right to his child. In the same, order in which the probate court concluded that no common-law marriage existed between the father and the mother, the probate court further stated:
*803 “3. [The father] lacks standing to contest the proposed adoption as [the father] was not the husband or presumed father of the minor and [the father] did not register with the Alabama Putative Father Registry [Ala.Code 1975, § 26-10C-1 et seq.].
“4. [The father’s] contest is DENIED for lack of standing.”
(Capitalization in original.)
Based on the foregoing alone, I would conclude that the father sufficiently preserved his due-process argument. But, of equal concern is that the main opinion draws a conclusion as to preservation that is directly at odds with the probate court’s own discussion of, and ruling as to, the father’s constitutional arguments. In the probate court’s closing colloquy it addressed and rejected those arguments amidst its discussion of its ruling as to the issue of common-law marriage:
“I believe—I believe the U.S. Supreme Court’s decision in Lehr can be distinguished from the facts in this case.
“I do believe that and conclude that [the father’s] equal protection rights, substantive and procedural due process rights of the Fourteenth Amendment have been and are adequately protected and have been properly addressed by this Court.
“Likewise, I believe—I find—I do not believe there is any violation of the Ninth Amendment as well.
“I would further note that Alabama’s Adoption Code, and more specifically, the Putative Father Registry—Alabama’s Putative Father Registry Act has been challenged constitutionally a couple of times, and the Alabama Supreme Court has held that it is constitutional ánd meets all federal and state constitutional requirements.”
(Emphasis added.)[17]
In other words, the probate court adjudicated not only the issue of common-law marriage, but also the issues whether the father had impliedly, irrevocably consented to—and thereby had relinquished the right to object to—the adoption by not-registering with the putative-father registry and whether that determination violated the father’s constitutional right to due process. Thus, I submit that the main opinion errs in concluding that the father “did not adequately apprise the probate court of the issue [he] now raises on appeal and did not provide the probate court with an opportunity to address or correct any alleged error before issuing a decision.” 230 So.3d at 792.[18] He clearly did.
PARKER, J., concurs.

. The "Affidavit of Paternity" executed by the mother and filed by J.W.B. and J.J.B. with the adoption petition states:
"The biological father of the minor child .'.. born to me on June 17, 2013, ... is somebody whose identity I refuse to disclose.” (Emphasis added.)

. Section 26-10A-2(5), Ala.Code 1975, defines "father” as "[a] male person who is the biological father of the minor or is treated by law as the father." (Emphasis added.)

.To construe the notice and consent provisions of the Alabama Adoption Code to authorize a mother to withhold from the probate court information as to the identity of her child’s father would mean that the due-process rights of that father may be determined in the sole discretion of the mother and in the interest of the adoptive parents, rather than by the independent judgment of a neutral judge.

, J.W.B. and J.J.B. filed their petition for adoption on June 19, 2013, two days after the child’s birth.

., Section 26—10A—7(3), Ala.Code 1975, requires the consent of a child’s "presumed father," including one who is married to the child’s mother When the child is born,

. lam baffled by the probate court’s passive acceptance of the mother’s position, and implicitly J.W.B.’s and JJ.B.’s position, that she could "refuse” to disclose a known father, particularly when the father still could exercise his right to file with the putative-father registry. Whether a known father is a "bad person” or a "good person” in'a mother’s estimation, he is entitled to the same' process from the court that is .flue' any known father who has not yet consented to an adoption petition concerning such father’s child, namely notice that a proceeding concerning his child has been filed. As the United States Supreme Court noted in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), what is at issue as to the application of a putative-father-registry statute is whether the statute “adequately protects] the father’s opportunity to form ... a relationship" with his child. 463 U.S. at 263, 103 S.Ct. 2985. And, as this Court has acknowledged, " ‘[t]he Putative -Father Registry Act has two .purposes; "protecting the rights of responsible fathers and facilitating speedy adoptions of children whose' fathers do not wish to assume-parental responsibility,”- Note, -"Protecting the UnWed Father's Opportunity to Parent; A Survey, of Paternity Registry Statutes,” 18 Rev. Litig. 703, 727 (1999).'” Ex parte S.C.W., 826 So.2d 844, 851 (Ala.2001), The purpose of the PFRA clearly is not as a tool to defraud a father of the very legal rights it was put in place to protect.

. Section 26-10A-10, Ala.Code 1975, discusses those persons from whom consent is not required. Section 26-10A-10 states:
"Notwithstanding the provisions of Section 26-1OA-7, the consent or relinquishment of the following persons shall not be required for an adoption:
[[Image here]]
“(6) The natural father where the natural mother indicates the natural father is unknown, unless the natural father is otherwise made known to the court.”
(Emphasis added.) Section 26-1OA-2 (definitions) does not define “natural father,” but, as noted above, it does define "father” as including the "biological father,” and it is well settled that the "natural father” is the "biological father.” See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Black's Law Dictionary 1189 (10th ed.2014) ("natural father. See biological father.”). Thus, in order to fconclude that a natural father is one from whom no consent "shall be required," it must appear that the natural father is "unknown” to the mother. Again, the Alabama Adoption Code does not authorize the mother’s withholding from the probate court the identity of a known father.

. As noted above, when J.W.B. and J.J.B. filed their petition for adoption, the father’s "past” acts would not support the conclusion that he had impliedly consented to the adoption. •

. There was purportedly "disputed” evidence as to whether the father "held himself out” as the father and supported the mother and child during her pregnancy. But, the supposed lack of interest by the father is contradicted not only by the 'father’s testimony, by the testimony of third parties, and by documentary evidence, but also by the mother’s actions. The fact that the mother felt the need to defraud the father by convincing him that his child was dead and encouraging him to move to Colorado under false pretenses does not support the notion that the father had expressed no interest in having a relationship with his child.

. The father’s reference to the mother’s fraud and to the fact that he was entitled to notice as a known "father” are not consistent with the position that he merely was raising the issue of his status as a "presumed father” based on a common-law marriage.

. The probate court's reference to “standing” is in error because that concept is "out of place in private-law cases,” Ex parte BAC Home Loans Servicing, LP, 159 So.3d 31, 44 (Ala.2013). The issue is not one of-"stand-, ing" but simply whether the father had a cognizable claiin to contest the adoption under the applicable facts and law. See id.; see also Har-Mar Collisions, Inc. v. Scottsdale Ins. Co., 212 So.3d 892, 907 (Ala.2016) (Murdock, J., dissenting) ("encouraging] members of the bench and bar to be mindful of” the Court's "recent precedents as to the inapplicability of 'standing' to private-law actions”).

. Even counsel for J.W.B. and J.J.B. noted that the father’s arguments had been addressed:
"Rebuttal on the common law marriage issue. We’ve already addressed the other issues as has the Supreme Court of Alabama in case after case. And he should have registered. And it’s an absolute bar to a contest. The only reason we’re here is to claim that he’s a legal father by virtue of any common law marriage.”
(Emphasis added.)

. In a footnote, the main opinion notes that the egregious facts do not relieve the father of the requirements as to preservation of error. See 230 So.3d at 792 n. 5. In that regard, of course, the main opinion is correct'. We simply disagree on whether the father did in fact preserve his due-process constitutional argument. Further, the ore tenus nature of much of the evidence received by the probate court, which is referenced in the same footnote, is inapposite to an assessment of whether the arguments made and positions taken by the father, as reflected in the record, were sufficient to achieve the preservation of his due-process constitutional argument. What is perhaps not inapposite is the gravity of that argument and the ramifications if it is not considered. Based on my review of the record, and without relying on any evidence re *804 ceived ore terms, I am confident that the proper approach in this case is to consider the father’s arguments as preserved.