Rel: March 27, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

## SC-2025-0655

_____

## Ex parte C.D.

## PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CIVIL APPEALS

## (In re: B.F.

## v.

## C.D. and A.D.)

### (Coffee Juvenile Court: JU-21-122.02;
### Court of Civil Appeals: CL-2025-0032)

BRYAN, Justice.

B.F. ("the father") filed a petition in the Coffee Juvenile Court ("the juvenile court"), seeking custody of his son, S.G.R. ("the child"). The juvenile court had previously placed the child in the custody of C.D. and her husband, A.D.; C.D. is a longtime friend of the child's mother, M.R. ("the mother"). The juvenile court denied the father's petition, and he appealed to the Court of Civil Appeals. The Court of Civil Appeals reversed the judgment, concluding that the juvenile court had applied the incorrect standard in evaluating whether the child's custody should be modified. B.F. v. C.D., [Ms. CL-2025-0032, Aug. 22, 2025] ___ So. 3d ___ (Ala. Civ. App. 2025). The juvenile court had applied the standard set forth in Ex parte McLendon, 455 So. 2d 863 (Ala. 1984); the Court of Civil Appeals concluded that the juvenile court should have applied the standard set forth in Ex parte Terry, 494 So. 2d 628 (Ala. 1986). In making that conclusion, the Court of Civil Appeals correctly determined that it was bound by this Court's decisions in Ex parte D.J., 645 So. 2d 303 (Ala. 1994), and Ex parte G.C., 924 So. 2d 651 (Ala. 2005). In a special concurrence, Presiding Judge Moore urged this Court to overrule Ex parte D.J. and Ex parte G.C.; all the other judges on that court joined

2

the special concurrence. C.D. then petitioned this Court for a writ of certiorari, asking this Court to overrule Ex parte D.J. and Ex parte G.C., and we granted the petition to consider that request. For the reasons discussed below, we now overrule Ex parte D.J. and Ex parte G.C. insofar as they conflict with the new standard that we establish today, and we reverse and remand.

The child was born out of wedlock in April 2021. In October 2021, the juvenile court determined that the child was dependent, and that court granted physical and legal custody of the child to C.D. and her husband, A.D. C.D. is a longtime friend of the mother, and C.D. and A.D. also have custody of two other children of the mother; those children are half siblings of the child. The mother voluntarily relinquished custody of the child and agreed that the child should reside with C.D. The juvenile court's order declaring the child to be dependent and granting custody to C.D. and A.D. also stated that the father of the child was unknown.

The father was incarcerated in June 2021, shortly after the child was born in April 2021 but before the child was declared dependent in October 2021. The father remained incarcerated until July 2022, when he entered a substance-abuse rehabilitation program. The father

3

finished that program in December 2023. In February 2024, the father filed a "Petition to Determine Paternity and Custody" in the juvenile court; insofar as the petition sought custody of the child, the juvenile court treated it as a petition to modify custody. On June 7, 2024, the juvenile court, relying on genetic testing, entered an order determining the father to be the child's biological father. Following an ore tenus trial, the juvenile court denied the father's petition to modify custody, but the court did award the father visitation with the child.

As noted, the juvenile court applied the standard set forth in Ex parte McLendon to determine whether custody of the child should be modified. On appeal, the Court of Civil Appeals concluded that the juvenile court should have applied the standard set forth in Ex parte Terry. In Ex parte Terry, this Court stated the standard in a custody dispute between a parent and a nonparent. Under that standard, "'[a] natural parent has a prima facie right to the custody of his or her child.'" Ex parte Terry, 494 So. 2d at 630 (quoting Ex parte McLendon, 455 So. 2d at 865). However, this "parental presumption" has two exceptions: "'[T]his presumption does not apply after a voluntary forfeiture of custody or a prior decree removing custody from the natural parent and

4

awarding it to a non-parent.'" Id. (emphasis omitted).  If no exception applies, the presumptive parental right "'can be overcome only by a finding ... that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" Ex parte Terry, 494 So. 2d at 632 (quoting Ex parte Mathews, 428 So. 2d 58, 59 (Ala. 1983)) (emphasis omitted).  However, as the Court of Civil Appeals noted in this case, that if one of the exceptions to the parental presumption is established,

> "the Terry standard is replaced by the McLendon standard, under which a parent will not be permitted to reclaim custody of his or her child unless the parent demonstrates that a change in the child's custody will materially promote the child's welfare and that the positive good brought about by the change will more than offset the inherently disruptive effect caused by uprooting the child.  See McLendon, 455 So. 2d at 865."

B.F., ___ So. 3d at ___.

In this case, the juvenile court concluded that the parental presumption set forth in Ex parte Terry did not apply because, that court concluded, the father had voluntarily forfeited his presumptive right to custody of the child.  Thus, because the juvenile court determined that the forfeiture exception to the Terry presumption applied, the court

5

applied the standard set forth in Ex parte McLendon. The source of contention in this case concerns the time frame that the juvenile court considered in evaluating whether the father had forfeited his presumptive right to custody. In Ex parte G.C., this Court, citing our decision in Ex parte D.J., stated a bright-line rule concerning the relevant period in evaluating whether a father has forfeited his presumptive right to custody of a child born to unmarried parents: "[A]n examination of whether a father of a child born to unmarried parents relinquished his right to custody of the child must begin at the point in time when the father was legally declared by a court to be the father of the child." 924 So. 2d at 657.[1] In this case, the juvenile court, in determining that the father had forfeited his right to custody, considered matters that occurred before the father was legally declared to be the child's biological father on June 7, 2024. Accordingly, the Court of Civil Appeals concluded that,

> "because he had not been adjudicated the legal father of the child until June 7, 2024, the father could not have voluntarily forfeited his right to custody of the child before June 7, 2024, and his prosecution of the present action, which he initiated

---

[1]There were various special writings in Ex parte G.C. As the main opinion and Presiding Judge Moore's special writing in this case noted, a review of the special writings in Ex parte G.C. shows that a majority of the Court fully concurred in that part of the main opinion addressing voluntary forfeiture.

6

several months earlier, establishes that he had not voluntarily forfeited his right to custody after June 7, 2024."

___ So. 3d at ___.   Concerning whether the juvenile court's judgment could be affirmed on the alternative ground that the second exception to the Terry presumption applied, the Court of Civil Appeals stated that,

> "because [the father] had not been adjudicated the legal father of the child before June 7, 2024, and, thus, had no right to custody of the child before June 7, 2024, the 2021 dependency judgment transferring custody of the child to C.D. and A.D. could not be considered a prior judgment removing the child from his custody."

___ So. 3d at ___.   Thus, the Court of Civil Appeals concluded that, because neither exception to the Terry presumption applied, "the juvenile court was required to consider the father's claim for custody under the Terry standard rather than under the McLendon standard." ___ So. 3d at ___.   Accordingly, because the juvenile court had applied the wrong standard, the Court of Civil Appeals reversed the judgment and remanded the case.

The Court of Civil Appeals correctly applied the rule stated in Ex parte G.C., which relied on Ex parte D.J.  However, Presiding Judge Moore wrote a special concurrence expressing his disagreement with those decisions and urging this Court to overrule them; all the other

7

judges on the court joined that writing. C.D. then petitioned this Court for a writ of certiorari, asking us to overrule Ex parte D.J. and Ex parte G.C., and we granted the petition.

In considering whether to overrule precedent, we are guided by the following principles: "Stare decisis is '[t]he doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation.' Black's Law Dictionary 1443 (8th ed. 2004)." Goldome Credit Corp. v. Burke, 923 So. 2d 282, 292 (Ala. 2005). However, "'[s]tare decisis is not an inexorable command.'" Ex parte Capstone Bldg. Corp., 96 So. 3d 77, 89 n.8 (Ala. 2012) (quoting 20 Am. Jur. Courts § 131 (2005)).

> "Although this Court strongly believes in the doctrine of stare decisis and makes every reasonable attempt to maintain the stability of the law, this Court has had to recognize on occasion that it is necessary and prudent to admit prior mistakes and to take the steps necessary to ensure that we foster a system of justice that is manageable and that is fair to all concerned."

Foremost Ins. Co. v. Parham, 693 So. 2d 409, 421 (Ala. 1997).

Presiding Judge Moore thoroughly argued in favor of overruling Ex parte D.J. and Ex parte G.C. insofar as those decisions addressed the period that a court may consider in determining whether a putative

8

father has voluntarily forfeited his presumptive right to a child born out

of wedlock:

> "As the main opinion holds, the supreme court's decisions in
> Ex parte D.J., 645 So. 2d 303 (Ala. 1994), and Ex parte G.C.,
> 924 So. 2d 651 (Ala. 2005), control the outcome of this case. I
> write specially to express my disagreement with those
> decisions and to urge the supreme court to overrule them.
>
> "In Ex parte D.J., V.J., the mother, and W.B.Z., the
> putative father, had never married, but they conceived a child
> together, B.W.J., who was born in 1983. V.J. and B.W.J.
> intermittently resided with D.J., the child's maternal
> grandmother. In 1991, V.J. unexpectedly died. W.B.Z.
> subsequently commenced legitimation proceedings regarding
> B.W.J., and D.J. filed a petition to obtain custody of B.W.J. in
> the Mobile Juvenile Court, which awarded her pendente lite
> custody. Upon a final hearing, the Mobile Juvenile Court
> awarded D.J. custody of B.W.J. On appeal, this court reversed
> the judgment, holding that the Mobile Juvenile Court had
> erred in failing to apply the parental presumption in favor of
> W.B.Z. See W.B.Z. v. D.J., 645 So. 2d 300 (Ala. Civ. App.
> 1993). Upon a petition for the writ of certiorari, the supreme
> court affirmed our decision.
>
> "In Ex parte Terry, 494 So. 2d 628 (Ala. 1986), our
> supreme court held that, in a child-custody dispute between a
> parent and a nonparent, the parent has a presumptive right
> to the custody of his or her child. In Ex parte D.J., the
> supreme court determined that the 'parental presumption'
> recognized in Ex parte Terry applies equally to a putative
> father of a child born out of wedlock because, it said, like any
> other natural parent, a putative father enjoys a prima facie
> right to the custody of his child as against a nonparent. The
> supreme court then explained that the parental presumption
> '"does not apply after [1] a voluntary forfeiture of custody or
> [2] a prior decree removing custody from the natural parent

9

and awarding it to a nonparent."' 645 So. 3d at 306 (quoting Ex parte McLendon, 455 So. 2d 863, 865 (Ala. 1984)). The supreme court decided that neither exception applied to W.B.Z. First, the supreme court held that W.B.Z. could not have voluntarily relinquished custody of B.W.J. to V.J. and D.J. because, the court noted, under the common law, V.J. had a right to exclusive custody of B.W.J. until her death. The supreme court then said:

> "'Guided by this rule, we conclude that W.B.Z., a putative father who, before V.J.'s death never possessed legal or physical custody of his unlegitimated child, acquired no custody rights that could have been relinquished to V.J. Custody vested exclusively in V.J. at the birth of her child and remained there until she died on April 27, 1991. W.B.Z. did not, therefore, relinquish any custody rights before V.J.'s death, because -- vis-à-vis V.J., at least -- he possessed none. Moreover, his promptness in initiating legitimation proceedings and in seeking custody after her death conclusively rebuts any contention that he relinquished custody rights thereafter. Thus, we conclude that the "relinquishment" exception to the parental presumption provided no basis for the standard applied by the trial court in this case.'

"645 So. 2d at 307. Second, the supreme court then held that the prior-judgment exception did not apply because W.B.Z. had never acquired custody of B.W.J. and no final judgment had been entered removing or transferring the custody of B.W.J. from him before the present litigation. 645 So. 2d at 307-08.

"In R.K v. R.J., 843 So. 2d 774, 781 (Ala. Civ. App. 2002), this court misconstrued Ex parte D.J. as holding that, until a putative father has been legally adjudicated to be the father of a child born out of wedlock, he has no custodial rights to

10

forfeit. This court held that, in determining whether a voluntary forfeiture has occurred, a trial court can consider only the conduct of a putative father after his paternity has been judicially established. In <u>R.O.M. v. B.B.</u>, 854 So. 2d 98 (Ala. Civ. App. 2003), Judge Murdock stated in a special writing concurring in the result that

> "'<u>Ex parte D.J.</u> stands for the proposition that if the issue in a custody case is whether a parent has voluntarily relinquished that custody, a trial court may not consider evidence of the parent's actual physical or psychological abandonment of the child that occurs before the parent is legally declared by a court to be the parent.'

"854 So. 2d at 105 (Murdock, J., concurring in the result). Actually, <u>Ex parte D.J.</u> did not hold that voluntary relinquishment by a putative father may occur only after his paternity has been judicially established; instead, the supreme court held that W.B.Z. had acquired custody rights to B.W.J. once V.J. lost custody of B.W.J. due to her death, and the supreme court examined the actions of W.B.Z. following that loss of custody, not just his actions after he had legitimated B.W.J., in deciding whether he had voluntarily relinquished his custody rights. <u>See</u> <u>Ex parte G.C.</u>, 924 So. 2d at 684 n.23 (Parker, J., dissenting) (explaining the substance of the holding of <u>Ex parte D.J.</u>). Thus, <u>Ex parte D.J.</u> holds that a trial court should consider the conduct of a putative father following the mother's loss of the custody of her child because that is when he gains a superior right to custody of the child.

> "Nevertheless, in <u>Ex parte G.C.</u>, Justice Stuart, writing for the court, adopted this court's misinterpretation of <u>Ex parte D.J.</u>, stating:

> > "'In <u>Ex parte D.J.</u>, 645 So. 2d 303 (Ala. 1994), this Court determined that an examination of whether

11

a father of a child born to unmarried parents relinquished his right to custody of the child must begin at the point in time when the father was legally declared by a court to be the father of the child. See also R.K. v. R.J., 843 So. 2d 774 (Ala. Civ. App. 2002); and R.O.M. v. B.B., 854 So. 2d 98, 105 (Ala. Civ. App. 2003) (Murdock, J., concurring specially).'

"924 So. 2d at 657. Thus, in determining whether G.C., Jr., the putative father in that case, had voluntarily forfeited his custodial rights to J.G.C., his child born out of wedlock, the supreme court considered only the conduct of G.C., Jr., after August 2000, when he was legally declared to be the father of J.G.C. Id. A close reading of the several special writings in Ex parte G.C. shows that a majority of the court -- Chief Justice Nabers and Justices Smith, Bolin, See, and Lyons -- concurred with the voluntary-forfeiture analysis used by Justice Stuart. So, as the law stands today, when determining whether a putative father has voluntarily relinquished his custodial rights to a child, a trial court may consider only evidence of his conduct occurring after his paternity has been established and must disregard any conduct occurring from the time the child is born to the date of the adjudication of paternity. In my opinion, that statement of the law is clearly erroneous.

"In Daniels v. Trawick, 232 Ala. 466, 467, 168 So. 551, 551 (1936), a young couple married, but separated after the wife gave birth to a child. A few weeks after the child was born, the wife and the child moved in with the child's maternal grandparents, while the husband resided separately on his family's farm. When the child was still an infant, the wife suffered a fatal illness, and, as a dying request, she indicated that she wanted the maternal grandparents to raise the child. A custody dispute arose between the husband, the presumed father of the child, and the maternal grandparents, and the trial court awarded custody of the child to the

12

maternal grandparents. The supreme court affirmed the judgment, saying:

> "'The prima facie right is with the father. ... The parent may forfeit this prima facie right by his conduct ..., and there is evidence justifying the conclusion that [the husband] was unkind and inattentive to his wife during her illness and indifferent to the child and its welfare (refusing to provide for it, except upon unjustifiable conditions), while [the maternal grandparents] were caring for them both in their humble home.'

"232 Ala. at 467, 168 So. at 552. <u>Daniels</u> shows that a natural father may, by his indifferent conduct toward a child and refusal to provide for the child as a father should, forfeit his right to custody of the child.

"In <u>Ex parte D.J.</u>, when B.W.J. was three years old, W.B.Z. moved to Texas. While residing in Texas, W.B.Z. had only negligible involvement with B.W.J. W.B.Z. did not attempt to legitimate B.W.J. or obtain his custody until after V.J. died. <u>See</u> <u>W.B.Z. v. D.J.</u>, 645 So. 2d at 303 (Thigpen, J., concurring in part and dissenting in part). Under the reasoning of <u>Daniels</u>, W.B.Z., by his indifference toward B.W.J. over many years, forfeited his parental presumption; however, in <u>Ex parte D.J.</u>, the supreme court did not analyze the case to determine whether W.B.Z. had forfeited his parental presumption; instead, it analyzed the case to determine whether W.B.Z. had 'voluntarily relinquished' his custody rights to the child, i.e., whether he had voluntarily and intentionally surrendered a known right. 645 So. 2d at 306. The supreme court reasoned that a putative father cannot relinquish his custody rights to a child born out of wedlock to the mother of that child because, as against the mother, he has no custody rights. The supreme court said: '[A] fortiori, [a putative father] cannot waive or relinquish a right that <u>does not exist</u>.' 645 So. 2d at 307. The supreme

13

court determined that W.B.Z. had received custody rights to the child only upon the death of the mother, and, therefore, it said, he could relinquish those rights only after that point. Accordingly, the supreme court confined its examination of the evidence to the actions of W.B.Z. after the date of the mother's death, which showed that he was enforcing his custody rights, and it disregarded W.B.Z.'s actions during the years when he had acquiesced in V.J.'s and D.J.'s providing almost exclusive care for the child. As a result, W.B.Z., a man who was almost a complete stranger to B.W.J., was determined to be entitled to custody without even a consideration of whether that custody arrangement would serve the best interests of the child.

"A comparison with Daniels shows that the holding in Ex parte D.J. bestows upon a putative father a parental presumption even stronger than the one bestowed on a presumed father -- a presumed father must act as a parent toward his child from the time the child is born, or otherwise forfeit his parental presumption, whereas a putative father can fail or refuse to act as a parent toward his child so long as the mother is exercising her superior right to custody, and his misconduct will not affect his right to the parental presumption once the mother dies or otherwise loses custody of the child. In essence, the supreme court held that a putative father cannot forfeit his custodial rights regardless of his misconduct toward the child until the law bestows upon him primary custody rights to the child. The supreme court justified this disparity in treatment solely on the nature of the legal rights of a putative father to a child born out of wedlock.

"It appears that the supreme court mischaracterized the nature of the custody rights of a putative father. Formerly, the putative father of a child born out of wedlock had no right to custody of the child, see Matthews v. Hobbs, 51 Ala. 210 (1874), but, in 1917, the supreme court held that a 'putative father is entitled to the ... custody [of a child born out of wedlock] as against any person but the mother.' Garrett v.

14

Mahaley, 199 Ala. 606, 608, 75 So. 10, 11 (1917). See also Ex parte Shuttleworth, 410 So. 2d 896, 899 (Ala. 1981); Griggs v. Barnes, 262 Ala. 357, 78 So. 2d 910 (1955); and Lewis v. Crowell, 210 Ala. 199, 200, 97 So. 691, 692 (1923). Thus, a putative father has at least secondary custody rights to a child born out of wedlock from the time the child is born. Furthermore, a putative father can acquire the same custody rights as the mother by legitimating the child. See B.E.B. v. H.M., 822 So. 2d 429, 431 (Ala. Civ. App. 2001) (holding that, upon legitimation of a child born out of wedlock, the putative father and the mother stand on equal footing in a custody dispute). If a putative father does not legitimate the child, he still has a right to form and engage in a paternal relationship with the child that the mother cannot unilaterally thwart. See D.W. v. J.W.B., 230 So. 3d 763, 775 (Ala. Civ. App. 2015), rev'd, Ex parte J.W.B., 230 So. 3d 783 (Ala. 2016). If a putative father avails himself of the unique opportunity presented by his biological connection to a child to fully commit to the rearing of the child, he is entitled to the same rights under federal law as a presumed father. See Lehr v. Robertson, 463 U.S. 248, 261-62 (1983). If a putative father does not act as a parent toward the child, the state is not obligated to give special consideration to his interests when deciding the custody of his child. Id.

"In Ex parte D.J., the supreme court excused W.B.Z. from acting as a real father toward the child on the ground that he had no custody rights to the child when, in fact, he did have certain custody rights that he did not seek to enforce while V.J. and D.J. cared for the child, such as the right to visitation, see Bagwell v. Powell, 267 Ala. 19, 22, 99 So. 2d 195, 197 (1957), the right to legitimate the child, see Ala. Code 1975, § 26-11-2, and the right to petition for custody of the child. See B.E.B., supra. During V.J.'s lifetime, W.B.Z. not only chose not to enforce his legal rights to assure a relationship with B.W.J., but he also intentionally absented himself from B.W.J. by moving to Texas and engaging in only negligible contact with B.W.J. for over five years. Yet, that

15

abandonment and its undoubted effect on B.W.J. was not even allowed to be considered in deciding who should receive custody of B.W.J. after V.J. died because, theoretically, W.B.Z. had no custody rights to B.W.J. to relinquish before her death.

"Our legislature recognizes that a putative father may forfeit his rights to a child born out of wedlock before he has acquired any custody rights vis-a-vis the mother. See Ala. Code 1975, § 26-10C-1(i) ('Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to subsection (a) prior to or within 30 days of the birth of a child born out of wedlock, shall be deemed to have given an irrevocable implied consent in any adoption proceeding.'); Ala. Code 1975, § 26-10E-9 (stating that a putative father who abandons the mother for four months while knowing she is pregnant is presumed to have impliedly consented to relinquish the unborn child for adoption). Our supreme court should also recognize that a putative father may forfeit his right to the parental presumption before he has acquired full custody rights to a child. The fact that the mother is exercising her superior custody rights to a child should not relieve a putative father of discharging his parental responsibilities to and for the child, even if his custody rights are considered secondary in nature. Ex parte D.J. should be overruled. See R.K. v. R.J., 843 So. 2d at 780 (noting irreconcilable tension between the holding in Ex parte D.J. and other child-custody cases). A child born out of wedlock deserves the love, affection, and care of both parents, just as a child born in wedlock, and, if the putative father fails to act as a real parent toward his child from the time the child is born, he should not benefit from any presumption that he is entitled to custody after the mother loses custody of the child.

"Likewise, the supreme court should overrule Ex parte G.C. The custodial rights of a putative father do not arise solely when paternity is judicially established, but, as shown, a putative father has certain limited custodial rights from the

time the child is born based strictly on his relationship to the child and any greater inchoate custody rights he may have ripen once the mother loses custody of the child. In cases in which the relationship between the putative father and the child is questioned, a judicial declaration of paternity may be necessary to settle the dispute, but that declaration is not the source of the putative father's rights. A trial court should not be precluded from considering the circumstances existing before paternity is judicially established in deciding whether a putative father should be entitled to the parental presumption. If a putative father knows, or should know, of his paternity of a child born out of wedlock and fails to seize his opportunity to forge a paternal relationship with the child, the trial court should be allowed to determine that he has voluntarily forfeited his presumptive right to custody of the child. See, e.g., K.C. v. D.C., 891 So. 2d 346, 349 (Ala. Civ. App. 2004) (holding that, once the mother of a child born out of wedlock acknowledged that she could not properly rear the child and asked her parents to assume custody of the child, the putative father had a superior right to custody of the child and his failure to act upon it resulted in a voluntary forfeiture of his rights, even though he had never been adjudicated to be the legal father of the child). Nothing in the law supports the rule adopted in Ex parte G.C."

___ So. 3d at ___ (Moore, P.J., concurring specially).

Presiding Judge Moore then discussed the juvenile court's determination that the father in this case had voluntarily forfeited his presumptive right to custody of the child. He then opined that, under a proper understanding of what the law should be -- but not what the law currently is under Ex parte D.J. and Ex parte G.C. -- the juvenile court's judgment would have been affirmed:

17

"In my opinion, the juvenile court correctly decided the case under the law as espoused in Daniels, supra, and a legion of other cases. The juvenile court reconciled conflicting evidence regarding the father's knowledge of his paternity, and, based upon its firsthand observations, it determined that the father knew or should have known that he was the biological father of the child soon after the child was born. The juvenile court assessed the father's conduct toward the child from that point and concluded that the father had not acted as a concerned parent toward the child for the first three years of his life. The juvenile court determined that the father had thereby voluntarily forfeited his presumptive right to custody, and it assessed the case to determine whether the best interests of the child would be materially promoted by a change of custody to the father. The father does not contest the ultimate determination denying his custody claim; he appeals the judgment by asserting only that the juvenile court should have applied the parental presumption. The judgment would be affirmed if Daniels remained in place.

"I agree, however, with the main opinion that the judgment violates the law as set forth in Ex parte D.J. and Ex parte G.C. Under Ex parte D.J., as misinterpreted by Ex parte G.C., when deciding whether the father had voluntarily forfeited his custody rights, the juvenile court could not consider the conduct of the father before June 7, 2024, when it adjudicated the paternity of the child. The juvenile court was required to close its eyes to the abandonment of the child by the father before June 7, 2024, and to pretend that the father was an active parent entitled to the parental presumption. However, the juvenile court did not apply that standard; instead, it based its finding of voluntary forfeiture exclusively on the conduct of the father before the paternity adjudication. This case clearly reveals how the opinions in Ex parte D.J. and Ex parte G.C. lead to unjust results. Upon reexamination, our supreme court should recognize the errors in those opinions. Unless and until they are overruled, however, those cases must be followed."

18

___ So. 3d at ___ (Moore, P.J., concurring specially).

As Presiding Judge Moore observed, in <u>R.K. v. R.J.</u>, 843 So. 2d 774 (Ala. Civ. App. 2002), the Court of Civil Appeals noted tension between <u>Ex parte D.J.</u> and other child-custody cases. Judge Murdock, writing for the court in <u>R.K.</u>, described this tension stemming from <u>Ex parte D.J.</u>, a tension that also applies to <u>Ex parte D.J.</u>'s progeny <u>Ex parte G.C.</u>, which was released three years after <u>R.K.</u>:

> "The 'voluntary forfeiture' exception to a natural parent's prima facie right to custody recognizes that a parent's voluntary forfeiture of his or her child tends to rebut the presumption that the parent in question will best provide the love, care, security, and upbringing the child needs. Concomitantly, it is a reflection of the well-established principle that 'ties of affection resulting from years of association between the child and its custodian' are relevant to a determination of the child's best interests. <u>See generally</u> <u>Dale v. Dale</u>, 54 Ala. App. 505, 507, 310 So. 2d 225, 227 (Ala. Civ. App. 1975); <u>McGrady v. Brown</u>, 230 Ala. 484, 161 So. 475, 476 (1935) ('"relinquishment of ... custody to another and continued acquiescence therein are matters to be considered by the court in determining the question of prime importance -- the welfare of the child"') (quoting <u>Payne v. Payne</u>, 218 Ala. 330, 331, 118 So. 575, 576 (1928)). As this court explained in <u>Borsdorf v. Mills</u>:
>
>> "'To tear [a child] from his home and those he knows as his parents and the source of love, safety and security merely to give sanction to a principle of priority of right is unconscionable. The principle of priority of right of a parent to custody

is founded upon the premise that because of a blood relation and instinct, such parent will better love and care for a child than one not so related. Such premise may be theoretically correct but practical experience has often proved it incorrect. The bonds of love between parent and child are not dependent upon blood relation and instinct, but may be forged as strongly in the crucible of day to day living. Out of the actual relationship of parent and child love grows. It is not merely a product of the biological function of conception and giving birth. To give paramount consideration to the principle of parental priority or ownership in custody decisions would often be an anathema to the best interest of the child.'

"49 Ala. App. 658, 661-62, 275 So. 2d 338, 341 (Ala. Civ. App. 1973) (quoted in part with approval in <u>Brill v. Johnson</u>, 293 Ala. 435, 437, 304 So. 2d 595, 597 (Ala. 1974) (Bloodworth, J., concurring specially, and joined by five members of the Court)).

"....

"In <u>Ex parte D.J.</u>, although the father of an illegitimate child knew of the child's existence and had abandoned the child, our Supreme Court held that there had been no 'voluntary forfeiture' for purposes of the natural father's presumptive claim to custody. The court reasoned that during the years the father had forfeited physical custody of the child, he had taken no steps to be adjudicated as the child's father and, therefore, could successfully assert that he had no <u>legal right</u> to custody of the child during that time. Without such a <u>right</u>, the <u>D.J.</u> court further reasoned, there could be no 'voluntary forfeiture.' 645 So. 2d at 306-07.

"....

20

"We note a tension between our Supreme Court's holding in Ex parte D.J. and the principles reflected in Borsdorf and the other cases discussed above. We also note that these latter principles are likewise reflected in federal constitutional jurisprudence.

"In Lehr v. Robertson, 463 U.S. 248, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983), the United States Supreme Court began its analysis by explaining that state law 'almost universally' expresses an appropriate preference for the formal family, but that in some cases the United States Supreme Court has held that the federal constitution provides even greater protection for certain formal family relationships:

"'In some cases, however, this Court has held that the Federal Constitution supersedes state law and provides even greater protection for certain formal family relationships. In those cases, as in the state cases, the Court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed. Thus, the "liberty" of parents to control the education of their children that was vindicated in Meyer v. Nebraska, 262 U.S. 390[, 43 S. Ct. 625, 67 L. Ed. 1042] (1923), and Pierce v. Society of Sisters, 268 U.S. 510[, 45 S. Ct. 571, 69 L. Ed. 1070] (1925), was described as a "right, coupled with the high duty, to recognize and prepare [the child] for additional obligations." Id., at 535[, 45 S. Ct. 571]. The linkage between parental duty and parental right was stressed again in Prince v. Massachusetts, 321 U.S. 158, 166[, 64 S. Ct. 438, 88 L. Ed. 645] (1944), when the Court declared it a cardinal principal "that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither

21

supply nor hinder." Ibid. In these cases the Court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection. See also Moore v. City of East Cleveland, 431 U.S. 494[, 97 S. Ct. 1932, 52 L. Ed. 2d 531] (1977) (plurality opinion).'

"Id. at 257-58, 103 S. Ct. 2985.

"Accordingly, the United States Supreme Court recognized in Lehr that '"[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."' Lehr, 463 U.S. at 260, 103 S. Ct. 2985 (quoting Caban v. Mohammed, 441 U.S. 380, 397, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979)). As the Lehr Court noted,

"'Commentators have emphasized the constitutional importance of the distinction between an inchoate and a fully developed relationship. See Comment, 46 Brooklyn L. Rev. 95, 115-116 (1979) ("the unwed father's interest springs not from his biological tie with his illegitimate child, but rather, from the relationship he has established with and the responsibility he has shouldered for his child"); Note, 58 Neb. L. Rev. 610, 617 (1979) ("a putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights ... will remove from him the full constitutional protection afforded the parental rights of other classes of parents"); Note, 29 Emory L.J. 833, 854 (1980) ("an unwed father's rights in his child do not spring solely from the biological fact of his parentage, but rather from his willingness to

22

admit his paternity and express some tangible interest in the child").'

"Lehr, 463 U.S. at 261, n. 17, 103 S. Ct. 2985. The Court therefore further recognized that an unwed father's demonstration of commitment to his child is determinative of his due-process rights:

"'When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban [v. Mohammed], 441 U.S. [380,] 392[, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." Id., at 389, n. 7[, 99 S. Ct. 1760]. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship." Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844[, 97 S. Ct. 2094, 2109-2110, 53 L. Ed. 2d 14] (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233[, 92 S. Ct. 1526, 32 L. Ed. 2d 15] (1972)).'

"Lehr, 463 U.S. at 261, 103 S. Ct. 2985 (emphasis added; footnote omitted).

23

"Conversely, when an unwed father fails to 'come forward,' he will not acquire substantial constitutional protection:

"'The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.'

"Lehr, 463 U.S. at 262, 103 S. Ct. 2985 (footnote omitted). See also M.V.S. v. V.M.D., 776 So. 2d 142, 146 (Ala. Civ. App. 1999) (relying on Lehr for the proposition that a biological father must have a 'substantial relationship' with a child in order to have a constitutional right to withhold consent to that child's adoption).

"Here, the unwed father clearly did not step forward when he could have. The courts of this State therefore are under no obligation to accord the father full United States Constitutional protection of his parental rights. In the eyes of federal jurisprudence, providing such protection would be inconsistent with the best interests of the child, given the father's lack of any substantial relationship with the child.

"The State of Alabama, however, may be free to make a different judgment as to what would be in the best interests of children who have been abandoned by their biological fathers. The State may decide, insofar as state law is concerned, that the physical abandonment of a child by an unwed, biological father (in contrast to such father's

24

abandonment of adjudicated paternity rights), should not prevent such a father from being on an equal presumptive footing with a fit, custodial mother -- and on better footing than all other parties, regardless of their historical relationships with the children -- if and when such a father's paternity is eventually adjudicated. Indeed, Ex parte D.J. appears to do that. There is therefore an unavoidable tension between the holding of Ex parte D.J. and the principles reflected in Lehr and the state authorities other than Ex parte D.J. discussed above."

R.K., 843 So. 2d at 777-82 (footnotes omitted).

We find Presiding Judge Moore's critique of Ex parte D.J. and Ex parte G.C. to be well reasoned, and his analysis is supported by Judge Murdock's insightful critique of Ex parte D.J. found in R.K. As Presiding Judge Moore observed, under the current standard, when a court evaluates whether a putative father has voluntarily forfeited his right to custody, that court "may consider only evidence of his conduct occurring after his paternity has been established and must disregard any conduct occurring from the time the child is born to the date of the adjudication of paternity." B.F., ___ So. 3d at ___ (Moore, P.J., concurring specially). That standard places a putative father of a child born out of wedlock in a stronger position than a presumptive father of a child born in wedlock who, under Daniels, "must act as a parent toward his child from the time the child is born, or otherwise forfeit his parental presumption." Id. at

25

___. We fail to see how a putative father who knows, or should know, that he is the father of a child should be placed in a stronger position than a presumptive father. To borrow a phrase used by Judge Murdock in R.K., a putative father who "did not step forward when he could have" should not be on better footing than a presumed father. R.K., 843 So. 2d at 782. "A child born out of wedlock deserves the love, affection, and care of both parents, just as a child born in wedlock." B.F., ___ So. 3d at ___ (Moore, P.J., concurring specially). As Presiding Judge Moore argued, a court should not be required to close its eyes to conduct that occurred before a court issued an order determining paternity. The father argues that abandoning Ex parte D.J. and Ex parte G.C. in this regard would punish him for failing to assert rights that he did not possess. However, as demonstrated in Presiding Judge Moore's special writing,

> "[t]he custodial rights of a putative father do not arise solely when paternity is judicially established, but, as shown, a putative father has certain limited custodial rights from the time the child is born based strictly on his relationship to the child and any greater inchoate custody rights he may have ripen once the mother loses custody of the child."

Id. at ___. In short,

> "[i]n cases in which the relationship between the putative father and the child is questioned, a judicial declaration of paternity may be necessary to settle the dispute, but that

26

> declaration is not the source of the putative father's rights. A trial court should not be precluded from considering the circumstances existing before paternity is judicially established in deciding whether a putative father should be entitled to the parental presumption."

Id. at ___.

Accordingly, we now state a new standard regarding the period that a court may consider in determining whether a putative father has voluntarily forfeited his presumptive right to a child born out wedlock. The relevant period begins when "a putative father knows, or should know, of his paternity of a child born out of wedlock." B.F., ___ So. 3d at ___ (Moore, P.J., concurring specially). We overrule Ex parte D.J. and Ex parte G.C. insofar as those decisions conflict with the standard that we state today. In adopting this new standard, we seek to reconcile the tension discussed above between, on the one hand, Ex parte D.J. and Ex parte G.C. and, on the other hand, principles reflected in other child-custody cases. We acknowledge that this Court "strongly believes in the doctrine of stare decisis and makes every reasonable attempt to maintain the stability of the law." Foremost Ins. Co., 693 So. 2d at 421. However, stare decisis is not an "'inexorable command,'" Ex parte Capstone Bldg. Corp., 96 So. 3d at 89 n.8 (citation omitted), and this Court "has had to

27

recognize on occasion that it is necessary and prudent to admit prior mistakes ...." <u>Foremost Ins. Co.</u>, 693 So. 2d at 421. Today, we conclude that it is necessary and prudent to adopt the new standard outlined above.

Therefore, we reverse the judgment of the Court of Civil Appeals, and we remand the case for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Stewart, C.J., and Shaw, Wise, Sellers, Mendheim, Cook, McCool, and Parker, JJ., concur.